**BRUMM, Appellant,**

v.

**McDONALD & COMPANY SECURITIES, INC., Appellee.**

[Cite as *Brumm v. McDonald & Co. Securities, Inc.* (1992), 78 Ohio App.3d 96.]

Court of Appeals of Ohio,
Ross County.

No. 1748.

Decided Jan. 28, 1992.

*William H. Allyn, Jr.,* for appellant.

*Calfee, Halter & Griswold, Ronald D. Holman II, Mitchell G. Blair* and *Brian M. Eisenberg,* for appellee.

**98**

STEPHENSON, Presiding Judge.

This is an appeal from a judgment entered by the Ross County Court of Common Pleas denying a motion to vacate an arbitration award granted to Pricie Brumm, plaintiff below and appellant herein, in her action against McDonald and Company Securities, Inc. ("McDonald"), defendant below and appellee herein. Appellant assigns the following errors for our review:

I. "The trial court erred in failing to have a trial and hearing on the issue of the arbitrability of the claims made by the plaintiff in her complaint pursuant to R.C. 2711.03 and in the life of the allegation by the plaintiff of the nonapplicability of the arbitration clause contained in the defendant's 'Options Trading Agreement.'"

II. "The trial court erred in finding the arbitration clause contained in the defendant's 'Options Trading Agreement' applicable to the claims asserted in the plaintiff's complaint in that the operative facts giving rise to the plaintiff's complaint occurred prior to the formation of the contract containing the arbitration clause."

III. "The trial court erred in failing to vacate the arbitration award pursuant to R.C. 2711.10."

The record reveals the following facts pertinent to this appeal. On or about January 26, 1988, appellant placed an order with McDonald to purchase, on her behalf, five thousand call options for stock of Federated Department Stores.[1] Later that day, McDonald gave telephone confirmation that the purchase had been consummated. On January 27, 1988, appellant received written confirmation of the purchase and, on the same day, entered into a certain "Options Trading Agreement" (the "option agreement") with McDonald.

On January 29, 1988, appellant remitted to McDonald the sum of $18,665 to cover the purchase of the call options.[2] Later that same day, appellant received notice from McDonald that it had, of its own initiative, "cancelled" the transaction. Testimony presented by McDonald's representatives below reveals that when this transaction was reviewed for suitability by principals at

---

1. A "call option" is generally defined as a contract under which one party purchases the right to buy stock at a specified price at, or within, a specified time from another party. See *Interstate Securities Corp. v. Hayes Corp.* (C.A.11, 1991), 920 F.2d 769, 771, at fn. 3; *Securities & Exchange Comm. v. Texas Gulf Sulphur Co.* (C.A.2, 1968), 401 F.2d 833, 841, at fn. 3.

2. The options were purchased at a unit price of $3.625, which when multiplied by 5,000 options results in a subtotal purchase amount of $18,125. The remaining amount of the purchase price paid by appellant was, apparently, a broker's commission on the transaction.

McDonald, the investment was considered far too risky and aggressive for one in appellant's financial position.[3]

Accordingly, McDonald proceeded to "cancel" the transaction by effecting a buy out of appellant's position. McDonald then sold the call options for less than their purchase price and sustained a loss. On, or about, February 10, 1988, appellant received a check from McDonald reimbursing her for the entire amount which she had previously remitted for the purchase of the call options. Appellant never cashed that check and evidence presented below reveals that the options substantially appreciated in price following the cancellation by McDonald.[4]

Appellant commenced the action below on May 2, 1988, alleging that McDonald had breached a contractual relationship with her. Appellant demanded judgment, *inter alia*, for compensatory damages in the amount of $92,500. On May 20, 1988, McDonald filed a motion to dismiss, or stay, proceedings on the basis that the previously mentioned option agreement provided that any dispute arising between the parties should be arbitrated.

On July 6, 1988, the court below sustained McDonald's motion and ordered all proceedings before the court to be stayed pending arbitration of the dispute. Appellant appealed from that decision and in *Brumm v. McDonald & Co. Securities, Inc.* (Aug. 1, 1989), Ross App. No. 1532, unreported, at 4, 1989 WL 86283, we dismissed said appeal for lack of a final appealable order pursuant to R.C. 2505.02.

The matter proceeded to arbitration on April 10, 1990. Subsequently, and without any explanation or reasoning, the arbitration panel awarded damages to appellant in the amount of $3,125. On July 17, 1990, appellant filed her motion and application to vacate the arbitration award, and McDonald filed its memorandum in opposition to such request. On November 21, 1990, the court below overruled appellant's motion to vacate and this appeal followed.

---

**3.** Testimony by Deborah Dahn, a senior registered options principal at McDonald, indicates that both the National Association of Security Dealers ("NASD"), as well as the stock exchanges, requires brokerages to approve customer accounts for option trading and to determine if a particular option transaction is appropriate for a customer. Dahn testified that the transaction in the cause *sub judice* was deemed inappropriate for appellant because she could have lost one hundred percent of her investment and because she was an elderly widow with nearly two thirds of her entire "liquid net worth" in that investment.

**4.** From testimony presented below, it would appear that appellant was concerned that she would be ratifying the action taken by McDonald if she cashed the check. However, the record indicates that, at the conclusion of the arbitration proceedings, the parties agreed that appellant would be issued a new check which she could cash without prejudicing any right to further recovery from McDonald.

Appellant's first assignment of error addressed the provisions of R.C. 2711.03 which state as follows:

"The party aggrieved by the alleged failure of another to perform under a written agreement for arbitration may petition any court of common pleas * * * for an order directing that such arbitration proceed in the manner provided for in such agreement. * * * The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the agreement. *If the making of the arbitration agreement or the failure to perform it is in issue, the court shall proceed summarily to the trial thereof.* * * *" (Emphasis added.)

In her memorandum contra to McDonald's motion to stay proceedings, appellant argued that there was no binding arbitration agreement in effect at the time of the events which gave rise to the dispute below. Thus, appellant concludes that the making of the arbitration agreement was brought into issue and the trial court was obligated to conduct a trial on that issue prior to ordering a stay of proceedings. We disagree.

Appellant's argument fails to distinguish between the different arbitration enforcement mechanisms provided for in R.C. Chapter 2711. The Ohio Arbitration Act allows for either direct enforcement of such agreements through an order to compel arbitration under R.C. 2711.03, or indirect enforcement through an order staying proceedings under R.C. 2711.02. 6 Ohio Jurisprudence 3d (1978) 40, Arbitration & Award, Section 39. These are separate and distinct procedures.

By its terms, R.C. 2711.03 applies where there has been a petition for an order to compel the parties to proceed to arbitration. McDonald did not seek, and the trial court did not grant, any such relief below. Rather, McDonald sought merely a stay of proceedings, which is guided by the following portions of R.C. 2711.02, which provided:

"If any suit or proceeding is brought upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceedings is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the agreement * * *."

There is no obligation under this statute to conduct a trial on the issue of the making of the arbitration agreement. Rather, the court need only be "satisfied" that the dispute is referable to arbitration under such agreement.

Although appellant argues, in substance, that the court below erred in determining that the dispute below was so referable, we consider that argument in reviewing appellant's next assignment of error and therefore do not address it here. Suffice it to say, there is no requirement under R.C. 2711.02 that the lower court conduct a trial on the issue of the making of the arbitration agreement and we discern no error in the absence of such a proceeding below. The first assignment of error is, accordingly, overruled.

In her second assignment of error, appellant contends that the trial court erred in determining that her dispute with McDonald was referable to arbitration. The basis for this contention lies with the timing of the execution of the aforementioned option agreement. At the conclusion of that document, the following is shown:

"The undersigned has · received, read and understands the most recent Options Clearing Corporation Prospectus and any supplement thereto and has also read and understands the foregoing agreement in its entirety.

"DATE Jan 27 1988 SIGN HERE s/ Pricie Brumm

"APPROVED s/ Debra D. Rufe

 Registered Options Principal

"DATE 2/1/88"

Appellant argues that a contract to arbitrate disputes between the parties did not arise until February 1, 1988, when an employee of McDonald "approved" the option agreement. Appellant continues that when McDonald bought out appellant's position with respect to the call options on January 29, 1988, there was, as yet, no binding arbitration agreement between them. Thus, appellant concludes, there could have been no agreement to submit this particular dispute to arbitration. We disagree.

 Generally speaking, arbitration is a matter of contract law and, therefore, the relationship between the parties is controlled both by the arbitration agreement and by the law of contracts. See *Teramar Corp. v. Rodier Corp.* (1987), 40 Ohio App.3d 39, 40, 531 N.E.2d 721, 722; see, also, 5 American Jurisprudence 2d (1962) 527, Arbitration & Award, Section 11.[5] In reviewing the option agreement, we note the preamble to the document states

---

5. The subject arbitration clause provides, in pertinent part, as follows:

"Any controversy between you and the undersigned arising out of our [*sic*] relating to this contract or the breach thereof, shall be settled to the extent consistent with Federal and State Law by arbitration * * *. Any arbitration hereunder shall be before at least three arbitrators and the award of the arbitrators, or of a majority of them, shall be final and judgment upon the award rendered may be entered in any court, state or federal, having jurisdiction."

that *"[t]his agreement confirms the understanding between us* with respect to puts and calls which you may purchase * * * for the account of the undersigned." (Emphasis added.) This clearly indicates that the document was intended as little more than a written memorandum or acknowledgment of an agreement which had already been reached.

Moreover, to the extent that an agreement had not already been reached between the parties, we note that the agreement primarily sets forth only covenants to be undertaken by appellant and that it appears to have been prepared by McDonald. Thus, appellant's signing of the agreement on January 27, 1988 would have been an acceptance of the terms offered therein by McDonald. In either event, the arbitration clause in the option agreement would have been enforceable by the time of those events which gave rise to the dispute below.

■ Notwithstanding our analysis of this issue, appellant has also failed to persuade us that the timing of the signatures on the option agreement is even relevant to enforcement of the arbitration clause. The provisions of both R.C. 2711.02 and 2711.03 allow only for the enforcement of a written agreement for arbitration. Thus, an agreement to submit to arbitration must be in writing in order for it to be enforceable under R.C. Chapter 2711. See *Teramar Corp.,* *supra,* 40 Ohio App.3d at 40, 531 N.E.2d at 722; *Peoples v. Holloway* (Dec. 3, 1985), Franklin App. No. 85AP–658, unreported, 1985 WL 4157; see, also, 6 Ohio Jurisprudence 3d (1978) 16, Arbitration & Award, Section 12.

However, there is nothing in those statutes which require signatures to be on those written agreements. In construing similar provisions under the Federal Arbitration Act, the federal courts have consistently held that, to enforce an arbitration clause, it is only necessary that the provision be in writing and it is not required that such writing be signed. See, *e.g., Med. Dev. Corp. v. Indus. Molding Corp.* (C.A.10, 1973), 479 F.2d 345, 348; *Fisser v. Internatl. Bank* (C.A.2, 1960), 282 F.2d 231, 233; see, also, *Joseph Muller Corp. Zurich v. Commonwealth Petrochemicals, Inc.* (S.D.N.Y.1971), 334 F.Supp. 1013, 1020; *Ocean Industries, Inc. v. Soros Assoc. Internatl., Inc.* (S.D.N.Y.1971), 328 F.Supp. 944, 947.[6] Indeed, the great majority of jurisdictions nationwide which require written arbitration contracts do not require the signatures of the parties in order to enforce them. 16 Williston, Contracts (1976) 163, Section 1919A. The reason for not requiring a party's signature

---

6. Provisions under federal law requiring a written arbitration agreement in order to obtain a stay of proceedings in a United States court are substantially similar to those provided under Ohio law. Compare R.C. 2711.02 and Section 3, Title 9, U.S. Code.

on an arbitration agreement as a prerequisite to enforcement was explained by the court in *Fisser, supra,* 282 F.2d at 233, as follows:

"It does not follow, however, that under the [Arbitration] Act an obligation to arbitrate attaches only to one who has personally signed the written arbitration provision. For the Act contains no built-in Statute of Frauds provision but merely requires that the arbitration provision itself be in writing. Ordinary contract principles determine who is bound by such written provisions and of course parties can become contractually bound absent their signatures. It is not surprising then to find a long series of decisions which recognize that the variety of ways in which a party may become bound by a written arbitration provision is limited only by generally operative principles of contract law." (Footnote omitted.)

This reasoning is highly persuasive. The policy of the law in Ohio is to favor and encourage arbitration. *Dayton Classroom Teachers Assn. v. Dayton Bd. of Edn.* (1975), 41 Ohio St.2d 127, 132–133, 70 O.O. 2d 223, 226, 323 N.E.2d 714, 718; *Brennan v. Brennan* (1955), 164 Ohio St. 29, 57 O.O. 71, 128 N.E.2d 89, at paragraph one of the syllabus. An application of wooden and technical rules with respect to the timing of signatures on an arbitration agreement would ill serve that policy. This is particularly true under the circumstances presented in the cause *sub judice.* At the very latest, appellant was made aware and assented to the arbitration clause on January 27, 1988, when she signed the option agreement. To hold that an enforceable arbitration contract between the parties was not formed until McDonald "approved" the signed option agreement would violate both legal policy and common sense. For these reasons, appellant's second assignment of error is overruled.[7]

■ In her final assignment of error, appellant contends that the trial court erred in not vacating the arbitrator's award. We disagree. Generally, an arbitration award carries a presumption of validity. See *Findlay City School Dist. Bd. of Edn. v. Findlay Edn. Assn.* (1990), 49 Ohio St.3d 129, 551 N.E.2d 186, at paragraph one of the syllabus. Thus, a trial court cannot vacate that

---

7. By analogy, we would further note that even those contracts required by the Ohio Statute of Frauds to be in writing will be enforceable so long as there is some memorandum or writing "signed by the party to be charged therewith." R.C. 1335.05. Thus, it is not required that the party seeking to enforce the contract also has signed the contract. The argument that a memorandum signed by only one party lacks mutual assent and that the contract should not be enforceable against either party unless both sign the memorandum has been consistently rejected as contrary to Ohio law. 51 Ohio Jurisprudence 3d (1984) 290, 291, Statute of Frauds, Section 146. We perceive of no reason why a stricter rule should be adopted for written arbitration agreements than for other contracts required to be in writing.

award unless one of the following criteria in R.C. 2711.10 is affirmatively shown:

"(A) The award was procured by corruption, fraud, or undue means.

"(B) There was evident partiality or corruption on the part of the arbitrators, or any of them.

"(C) The arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.

"(D) The arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made."

■ The appellate review of an arbitration award is limited to an evaluation of the confirmation order of the common pleas court and we cannot review the substantive merits of the award absent evidence of material mistakes or extensive impropriety. *Oil, Chemical & Atomic Workers Internatl. Union, AFL–CIO, Local 7–629 v. RMI Co.* (1987), 41 Ohio App.3d 16, 20, 534 N.E.2d 110, 114; *Lynch v. Halcomb* (1984), 16 Ohio App.3d 223, 224, 16 OBR 238, 239, 475 N.E.2d 181, 183. Appellant advances several arguments to the effect that such events occurred below.

Appellant first draws our attention to the disparity between the award rendered by the arbitrators and the damages to which she would have been entitled under her claims against McDonald. Thus, appellant asserts, "there is no rational nexus between the issues supposedly submitted to the arbitration board and the monetary finding by them in the amount of $3,125.00 * * *." McDonald responds, however, by characterizing that award as only nominal damages. After a thorough review of the record, we are persuaded that sufficient evidence was adduced below to sustain that characterization.

■ Appellant contends that her claims against McDonald were in conversion and breach of contract. The measure of damages in a conversion action is the value of the converted property at the *time of the conversion. Erie RR. Co. v. Steinberg* (1916), 94 Ohio St. 189, 113 N.E. 814, at paragraph two of the syllabus; *Baird v. Howard* (1894), 51 Ohio St. 57, 36 N.E. 732, at paragraph one of the syllabus. The uncontroverted evidence adduced below was that, at the time of their conversion, the call options were trading at a lower price than that at which they were originally bought. Furthermore,

appellant was reimbursed for her entire purchase price notwithstanding the interim drop in value. If believed, this evidence would be sufficient to convince any reasonable arbitrator that no compensatory damages were warranted under a conversion claim.

There is also equally persuasive evidence that no compensatory damages would have been warranted under appellant's breach of contract claim.[8] The relationship between a broker and a customer on whose behalf stock will be purchased is that of agent and principal. See *Lamprecht v. State* (1911), 84 Ohio St. 32, 41, 95 N.E. 656, 657; see, also, *Thropp v. Bache Halsey Stuart Shields, Inc.* (C.A.6, 1981), 650 F.2d 817, 819. An agency relationship, of course, is contractual in nature and may be created by express agreement. 3 Ohio Jurisprudence 3d (1978) 32, Agency, Section 18. Thus, the specifics of the agency relationship between a stockbroker and customer will be determined by their employment contract. In formulating such contract, the parties may adopt trade usage and custom as part of their agreement. 5 Williston, Contracts (1961) 32–34, Section 651. To that end, we note the following portion of the option agreement which evidences the employment contract between the parties herein:

"All option transactions executed on the Chicago Board of Options (CBOE), American Stock Exchange (AMEX) or any other option exchange, shall be subject to the rules, constitution, regulations, customs and practices of those Exchanges and to those of the Options Clearing Corporation and *I agree to comply with all such rules as they may apply to my transactions.*" (Emphasis added.)

Additionally, we note a number of cases in which customers of stockbrokers are deemed to have contemplated and authorized a course of dealing in accordance with rules and customs of the stock exchanges. See, *e.g., White v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1966), 90 N.J.Super. 565, 570, 218 A.2d 655, 657–658; *Lynch v. Maw* (1955), 3 Utah 2d 271, 274, 282 P.2d 841, 843; *Korns v. Thomson & McKinnon* (D.Minn.1938), 22 F.Supp. 442, 447. Thus, the exchange rules are deemed incorporated into any agreement between customer and broker. *Thomson McKinnon Securities, Inc. v. Clark* (C.A.11, 1990), 901 F.2d 1568, 1570–1571. The uncontroverted evidence presented below was that McDonald was required by, among others, the various

---

**8.** Appellant does not elaborate on the nature of her "breach of contract" claim. Inasmuch as the purchase contract for the call options had already been executed and completed, we presume that she refers to her contract employing McDonald as her agent.

stock exchanges to determine if a trade was suitable for a client. Thus, if the testimony was believed, the arbitrators could reasonably have found that McDonald operated within the parameters of the option agreement and that its only mistake was in not stopping the acquisition before it occurred rather than afterward.

We do not attempt to speculate as to the reasoning behind the amount of the arbitration award. Undoubtedly, a more detailed opinion from the board of arbitrators would have been beneficial in understanding why the award was fixed at $3,125. However, in light of the foregoing analysis, we are not persuaded that the arbitration panel made a "material mistake" in reaching that result.

We are equally unpersuaded that the award evidences any "extensive impropriety." Appellant suggests the award should be vacated because it was "a simple majority award and not unanimous." This is meritless as Ohio law only requires that a majority of the arbitrators sign the award. See R.C. 2711.08. Appellant also claims that the award should be vacated because she was denied "fundamental fairness and due process," as well as the opportunity to subpoena material evidence. However, appellant fails to cite us to any specific instances in the record to support this argument, as required by App.R. 12(A), and we cannot discern any in our own review. For these reasons, appellant's third assignment of error is overruled.

Having considered all errors assigned and argued herein, and finding the same to be without merit, the judgment of the trial court is affirmed.

*Judgment affirmed.*

HARSHA and PETER B. ABELE, JJ., concur.