O P I N I O N
Jeffrey Rudd appeals from a judgment of the Montgomery County Common Pleas Court granting summary judgment in favor of appellees, Online Resources, Inc., Ron Hartke, and Judith Cornett. The case involves a dispute over ownership of stock in Online Resources. The dispute turns on the validity of written agreements in which Rudd apparently transferred all of his shares to Cornett. Rudd initiated the suit in which both sides asked for a declaratory judgment. After hearing the evidence, the trial court found in favor of the appellees. Rudd now argues that the agreements were not binding contracts because they lacked the essential elements of valid contracts, because certain conditions precedent were not met, and because he signed the agreements under duress. We conclude, however, that the agreements met the elements for contractual formation. Moreover, we find that any unfulfilled obligations in the agreements were not conditions precedent. Finally, we find that evidence supported the trial court's determination that Rudd was not under duress when he signed the agreements. Therefore, we affirm.
 I.
The facts of the case are as follows. Online Resources is an Ohio corporation created in June, 1995. The company provides computer support services and resources to other businesses. Initially, Rudd and Cornett were the sole shareholders in the corporation. Rudd owned 49 shares, and Cornett owned 51. Rudd and Cornett had operated the business as equal partners since 1988 before choosing to incorporate in 1995. The couple also had a more intimate relationship and were living together when the corporation was founded.
In May, 1995, Ron Hartke joined the company. Before that time, the company had been having trouble earning a profit. Thus, Rudd and Cornett chose to bring in Hartke, who had more business experience than they did, and who was willing to invest more capital in the corporation. In an agreement dated July 24, 1995, Rudd sold 11 of his shares to Hartke for $33,000. In that same agreement, Hartke also agreed to purchase 22 more shares within two years for an additional $67,000.
Soon after Hartke joined the company, the business and professional relationships between the three stockholders deteriorated, and it became increasingly difficult for the three to work together. By the end of May, 1996, Rudd and Cornett were no longer living together. The relationship between Rudd and Hartke became especially bitter. At a meeting on June 10, 1996, Cornett and Hartke told Rudd that they could no longer work with him. Rudd, in response, told them that they should buy out his interest in the corporation.
Over the course of May and June, the parties attempted to negotiate an end to their business relationship. Several different proposals were drafted, none of which was found acceptable. At one point, the parties attempted to resolve their differences through an impartial mediator, but that attempt was also unsuccessful.
On June 30, 1996, Rudd met with Cornett over breakfast at a Bob Evans restaurant in Centerville, Ohio. Cornett brought with her a new "BuyOut Proposal," printed in outline form with a place at the bottom for signatures. Rudd examined the proposal and rejected certain of the terms, sometimes by drawing a line through the offending provision. Cornett then handwrote new provisions in according to Rudd's suggestions. Rudd initialed each of the handwritten changes. Rudd then signed and dated the document in the space provided beneath a line stating "I understand and agree to the above terms and conditions."
Among the terms of the amended buy-out proposal were the following. Rudd agreed to transfer all of his shares to Cornett immediately. Rudd was to receive a $25,000 payment, with $20,000 applied to reduce his personal debt. He was also supposed receive his current wage for the project he was currently completing, and $35 per hour for any projects that he took on upon request. The agreement offered Rudd lead-referral commissions at the "going rate," later determined to be 5% of collected sales, less direct expenses. Rudd was also supposed to be relieved of any personal obligation for company bank loans. In addition, there was a provision stating that the "BuyOut Rate" was to be determined "at Judy's [Cornett's] discretion." That provision replaced one in which Rudd was to receive 5% of collected sales, less direct expenses, for two years.
There was also a "Non-Compete, Confidentiality, and Non-Disclosure" provision in the agreement. The originally-proposed term ran for one year after the time in which Rudd was "being compensated." Rudd struck out the language setting out the term of the non-compete agreement, but no new language was added to replace it. A new provision was added stating that the list of clients, prospects, and contacts with whom Rudd could not have contact was "to be determined and agreed upon by 7-9-96." The parties, however, never reached an agreement on such a list.
As noted, the buy-out proposal contained a provision in which Rudd agreed to transfer all of his shares to Cornett. At the breakfast meeting, in accordance with that provision, Rudd drafted a new document on a sheet of paper he pulled from his day planner. Rudd wrote that he agreed to transfer all of his shares in Online Resources to Cornett at a cost of one dollar. He signed the document and dated it June 30, 1998, as did Cornett. Cornett then wrote "purchased 6-30-96 Judith A. Cornet," which Rudd witnessed by signing his initials.
The chief factual dispute in this case concerns the tenor of the breakfast meeting on June 30. Rudd testified that the meeting was highly confrontational. When first presented with the proposal, he said, he attempted to walk out. Cornett, however, threatened that, if Rudd did not agree to a buy-out that day, she would kill herself and kill Rudd's pet dog and other pets that were still living with Cornett at the couple's former residence. Rudd was leaving the next morning to go to California on a business trip for Online Resources that was supposed to last one week. Thus, according to Rudd, he felt pressured by Cornett's threat and attempted to placate her by attempting a negotiation. Rudd said that he never intended to be bound by the agreements that he signed.
Cornett testified, to the contrary, that the meeting was a relatively calm one. She said that she did not threaten suicide, and that she never threatened to kill the pets that she kept with her. Cornett admitted that she had threatened suicide during an argument when the couple was living together some five years earlier, but that threat had nothing to do with Online Resources. Cornett said that Rudd assigned all of his shares to her because he did not want any shares to go to Hartke.
Another factual dispute centered on whether certain terms were added to the buy-out proposal after Rudd signed it. The proposal has a handwritten emendation stating "Jeff Rudd is assigning all of his shares to Judy Cornett." Below that is another emendation, in the same handwriting, stating "for the compensation of $1.00." Rudd testified that the latter provision was not present when he signed the proposal. He explained that the dollar figure was not discussed until the second agreement was drafted, and therefore it could not have appeared in the earlier agreement. Cornett testified that the one-dollar compensation provision did appear in the proposal before Rudd signed it. She stated that the only thing added at a later time was a note showing the percentage of ownership for the three former and present stockholders after the transfer. That note merely repeated information stated elsewhere in the agreement.
When Rudd returned from California he informed Cornett and Hartke that he did not think that the papers he had signed before he left were binding on him. Cornett and Hartke had directed the corporation's attorney to draft a more formal version of the buy-out agreement, but Rudd refused to sign it. Instead, he informed the others that he wished to exercise an option in an earlier agreement to purchase shares from Cornett in order to bring them into parity of ownership. On August 15, 1996, Cornett and Hartke terminated Rudd's employment, and locked him out of the company offices.
Rudd filed suit for a declaratory judgment on October 15, 1996, asking the court to find that he did not transfer any of his shares in Online Resources to Cornett. Cornett and Hartke responded with a counterclaim asking for a declaratory judgment. They also made claims of breach of fiduciary duty and contractual interference, and they requested an equitable accounting of corporate assets. Online Resources also filed a counterclaim alleging fiduciary breach and contractual interference, and asking for an equitable accounting.
On July 29, Online Resources moved to dismiss all of its counterclaims without prejudice. Cornett and Hartke moved similarly to dismiss all of their claims except the one for a declaratory judgment.
Trial was held on July 29 and September 11, 1997. On September 23, the trial court entered a decision in favor of the defendants' declaratory judgment claim and adverse to Rudd's. The court found that Rudd had transferred all of his shares to Cornett. Rudd now appeals from that judgment.
 II.
Rudd raises a single assignment of error, which is as follows:
 THE TRIAL COURT'S FINDING THAT THERE WAS A CONTRACT TRANSFERRING THE STOCKOWNERSHIP OF APPELLANT, JEFFREY H. RUDD, IN APPELLEE, ONLINE RESOURCES, INC., TO APPELLEE, JUDITH CORNETT, IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND CONTRARY TO LAW.
 In support of this broadly-phrased assignment of error, Rudd raises three distinct arguments. First, he argues that the papers he signed on June 30, 1996, were not binding contracts because the essential elements for a contract did not exist. Second, he argues that he was not bound to transfer shares to Cornett because the appellees failed to fulfill certain conditions precedent. Third, and finally, he claims that the court erred in failing to find that he signed the contracts under duress. We will consider each of these arguments separately.
As a prefatory matter, we note that the issue of whether a contract exists raises a mixed question of fact and law.McSweeney v. Jackson (1996), 117 Ohio App.3d 623, 632. An appellate court may freely review application of the law to the facts. Id. It must, however, show deference to the factual findings made by the trial court. Where there are factual disputes, it is generally the province of the trial court to resolve those disputes by weighing credibility of the proffered testimony. Id.
Rudd has generally asserted error in connection with the trial court's ultimate determination of the mixed question of whether a contract existed. By raising the question of manifest weight, he has also specifically challenged the trial court's factual findings. In civil matters, our review of the weight of evidence is limited to a determination of whether the judgment was "supported by some competent, credible evidence going to all the essential elements of the case." C.E. Morris Co. v. Foley Constr.Co. (1978) 54 Ohio St.2d 279, paragraph one of the syllabus; see also Reed v. Key-Chrysler Plymouth (1998), 125 Ohio App.3d 437,439-441 (discussing manifest-weight review in a civil context).
A. Elements of a Contract
The elements of a contract have been variously articulated. Generally, to prove the existence of a contract, a party must show mutual assent (usually, offer and acceptance) and consideration.Nilavar v. Osborn (Mar. 27, 1998), Clark App. No. 97-CA-95. unreported, at 4. That party must also show that there was a "meeting of the minds" and that the contract was definite as to its essential terms. Id.
The element of mutual assent, offer and acceptance, is easy to discern in the instant case. In regard to the buy-out proposal, the agreement itself constituted an offer, and Rudd indicated his acceptance by signing the agreement. Generally, when a party has signed an agreement, it must be presumed that he has accepted its terms. See Brumm v. McDonald Co. Securities,Inc. (1992), 78 Ohio App.3d 96, 103; see also 17 Ohio Jurisprudence (1980) 448-449, Contracts, Section 18. In regard to the agreement transferring shares, both parties signed the agreement. That fact is sufficient to show mutual assent. See 17 Ohio Jurisprudence (1980) 448-449.
Rudd suggests that consideration for the transfer was inadequate, arguing that a share-transfer worth many thousands of dollars could not turn on "$1.00 and the cost of breakfast." As a general rule, however, "consideration is not insufficient merely because it is inadequate." Mooney v. Green (1982), 4 Ohio App.3d 175,177. Courts, therefore, do not inquire into the adequacy of consideration as long as some consideration is given. Carlisle v.T R Excavating, Inc. (1997), 123 Ohio App.3d 277, 283. Even the nominal amount of one dollar given in the transfer agreement would be sufficient to support the existence of a contract.
In any event, Rudd received more than one dollar and breakfast in return for ceding ownership in Online Resources to Cornett. As already noted, he was to be relieved of all personal obligations for the company's bank debt, and he was to receive a $25,000 payment, lead-referral fees, and other payments. In addition, he may be entitled to some payment under the provision setting a buy-out rate at Cornett's discretion. That question, however, was not raised or addressed below. As the trial court noted in its decision, the question of how much remuneration was due to Rudd was not before the court; only the question of ownership was raised. In light of the things that Rudd was promised, the contracts do not fail for lack of consideration.
Rudd also argues that there was no "meeting of the minds" and, therefore, no contract. As we understand this argument, Rudd is claiming that, since he did not intend to transfer his shares, there was no meeting of the minds. The term "meeting of the minds," however, tends to generate a great deal of confusion. If one person does not intend to be bound by an agreement he has made, and the other person is not aware of that lack of intention, there is no "meeting of the minds" as a layman might understand the phrase. Nevertheless, unless there is a mutual mistake or some like occurrence, the law is only interested in objective manifestations of intent. Nilavar, supra, at 6. Expressions of assent are generally sufficient to show a meeting of the minds. Thus, one person's unexpressed reservation does not prevent there being a meeting of the minds as that term is recognized in law.Id.
Here, Cornett drafted one document, and Rudd signed it; and both parties signed the second document. These facts are sufficient to show a meeting of the minds through objective manifestations of intent. Certainly, if Rudd was coerced into signing the documents against his will, as he alleges, there was no meeting of the minds. Nevertheless, we will consider that question later in our discussion of his duress claim.
Finally, for a contract to exist, there must be certainty as to its essential terms. Rudd does not specifically allege that any particular terms in the agreements were uncertain. Nevertheless, we note that there are two provisions in the buy-out agreement that are indefinite. First, one provision states that the "BuyOut rate" is to be determined at Cornett's discretion. Second, the non-compete clause in the agreement states: "list to be determined and agreed upon by 7-9-96."
A contract is void for indefiniteness only if it is indefinite as to its essential terms; indefiniteness of non-essential terms does not invalidate an otherwise complete agreement. Nilavar, supra, at 6. In a contract that is not for goods, the essential terms are, generally, the parties and the subject matter. Id. In the buy-out agreement, it is sufficiently clear that Rudd, Cornett, and Hartke are the contracting parties.
As to the subject matter, the two indefinite provisions in the contract are certainly problematic. The "BuyOut Rate" provision, depending on its interpretation, may suggest that Rudd was supposed to be paid some indefinite amount. The non- compete provision, also, leaves open the possibility that the parties might not agree on the length and extent of the non-compete agreement — which is what, in fact, occurred.
Generally, it can be said that no contract exists if both parties contemplate that something remains to be done to form a contract. 17 Ohio Jurisprudence 3d (1980) 472, Contracts, Section 40. Nevertheless, the fact that certain terms remain to be negotiated or determined by judicial resolution does not create an indefiniteness that necessarily invalidates the contract. Mr.Mark Corp. v. Rush, Inc. (1983), 11 Ohio App.3d 167, 169. Indeed, "the actions of parties may show that they intended to create a binding agreement, even though one or more term is left to be agreed upon." Crawford v. By Lamb Builders, Inc. (Aug. 10, 1993), Franklin App. No. 93AP-282, unreported, at 5, citing Restatement of Law 2d, Contracts (1981) 92, Section 33.
In the instant case, we are able to ascertain the intent of the parties even though they did not agree on all the terms of the buy-out. In that regard, Rudd, on the same day that he signed the buy-out proposal, also signed the separate agreement immediately transferring his shares to Cornett. This fact shows that the parties intended that the buy-out agreement, which included a transfer provision, should take effect immediately. Therefore, although the parties left certain items, such as the buy- out rate and the extent of the non-compete clause, for future determination, they did not contemplate that future action would be required before the contract was formed.
There is no indefiniteness, moreover, in the agreement transferring shares to Cornett for consideration of one dollar. Nevertheless, Rudd argues that the transfer agreement cannot be viewed independently of the buy-out proposal. He argues that the faults of the latter effectively invalidate the former. The transfer agreement, however, is a complete and unambiguous agreement on its face. A court should not look beyond the four corners of an agreement unless some necessity arises that compels it to do otherwise. Natl. Union Fire Ins. Co. of Pittsburgh, Pa.v. Shane Shane Co., L.P.A. (1992), 78 Ohio App.3d 765, 769. Because that agreement unambiguously transferred Rudd's ownership interest to Cornett, the validity of that agreement alone would be sufficient to support the trial court's determination of the declaratory judgment action.
Furthermore, we have not viewed the agreements as entirely separate. We have found that with the transfer agreement Rudd met his obligation to cede his shares to Cornett under the buy-out agreement. The fact that the transfer took place immediately shows that the parties intended to form a contract with the buy-out agreement even though certain terms were left unresolved. In any event, our resolution of this argument has no effect on the outcome of the case. Because both agreements met all the elements of contractual formation, their independence or interdependence is of no import.
B. Conditions Precedent.
Rudd argues that the various provisions of the buy-out agreement were conditions precedent to his transferring shares in the company. It is not disputed that many of the provisions have not been fulfilled. No agreement was reached on the non- compete clause, for example. Also, Online Resources did not make a number of the payments promised to Rudd in the agreement. Hartke testified that the payments were not made because Rudd had breached the contract.
"A condition precedent is a condition which must be performed before the obligations in the contract become effective." Trohav. Troha (1995), 105 Ohio App.3d 327, 334. Thus, if a condition precedent is not fulfilled, a party is excused from performing the duty promised under the contract. Id. Whether a provision is a condition precedent or merely a promise to perform is a question of the parties' intent. Id. Intent may be ascertained by considering the language of a particular provision, the language of an entire agreement, or the subject matter of an agreement.Id.; see also 18 Ohio Jurisprudence 3d (1980) 84-85, Contracts, Section 187. Conditions precedent are not favored by the law, and whenever possible courts will avoid construing provisions to be such unless the intent of the agreement is plainly to the contrary. 17A American Jurisprudence 2d (1991) 491-491, Contracts, Section 471, citing Restatement of Law 2d, Contracts, Section 227.
Here, the language of the agreement shows that there were no conditions precedent to Rudd's duty to convey his shares to Cornett. The agreement stated that it was "to be effective immediately." That provision could only apply to Rudd's obligation to convey his shares. The agreement expressly permitted Online Resources to time its payments to Rudd in order to obtain the "maximum tax advantage." Under the agreement, negotiation of a non-compete clause was postponed until July 9, 1996, some nine days after the agreement was signed. As a consequence, it appears that Rudd's obligation to transfer shares was immediate and did not depend on the fulfillment of any condition. The fact that Rudd immediately transferred his shares after signing the agreement only confirms the validity of this conclusion.
Therefore, we reject Rudd's argument that his obligation to transfer ownership depended upon the fulfillment of some conditions. By signing the agreement, Rudd took upon himself an immediate obligation to transfer his shares. Whether either party then breached other obligations under the contract is beyond the scope of our review. Neither party pursued a claim for breach of contract in the trial court.
C. Duress
Rudd's final argument consists of the claim that he signed the agreements under duress. As already noted, Rudd maintained that Cornett coerced him into signing the agreements by threatening to kill herself and several of the couple's pets.
Four requirements are necessary to show duress by threat: (1) there must be a threat; (2) the threat must be improper; (3) the threat must induce the victim's manifestation of assent; and (4) it must be sufficiently grave to justify the victim's assent.Id. at 257. Hilb, Rogal Hamilton Agency of Dayton, Inc. v.Reynolds (1992), 81 Ohio App.3d 330, 337. In sum, the essential question in each case involving a claim of duress is whether the person claiming duress was deprived of his freedom of will, and that is a question of fact. Gallaher Drug Co. v. Robinson, (M.C. 1965), 13 Ohio Misc. 216, 217
The trial court explicitly found that Rudd was not acting under duress when he signed the agreements. As we have explained above, this court's review of a lower court's factual finding is limited to a determination of whether that finding is "supported by some competent, credible evidence going to all the essential elements of the case." C.E. Morris Co. v. Foley Constr. Co. (1978)54 Ohio St.2d 279, paragraph one of the syllabus; Reed v.Key-Chrysler Plymouth (1998), 125 Ohio App.3d 437, 439-441. Here, Cornett testified that she made no threat that induced Rudd to sign. If the trial court believed that testimony, that belief would be sufficient to support its determination that Rudd did not act under duress.
In his appellant's brief, Rudd emphasizes the fact that Cornett had previously threatened suicide. He also notes that she was forced to recant certain assertions that she had made in the affidavit accompanying her summary judgment motion. Cornett's affidavit had stated that Rudd made all of the changes to the buy-out proposal. In fact, other than lines striking out parts of the original proposal, Cornett had made all the changes. Cornett admitted that her affidavit was inaccurate at trial. By raising these facts, Rudd essentially asks us to weigh the credibility of the witnesses: Cornett and himself.
Even when exercising the broader scope of manifest-weight review that the Supreme Court has mandated in criminal cases, seeState v. Thompkins (1997), 78 Ohio St.3d 380, 387, this court has been reluctant to weigh the credibility of witnesses. See State v.Chandler (July 31, 1998), Montgomery App. 16615, unreported, at 5. As we noted in Chandler, "Given the limitations of an appellate record in conveying all of the indicia of a witness' credibility, caution urges us not to disagree too quickly with the original factfinder." Our review of such matters, even in the criminal context, is greatly restrained. Significant deference is due to the factfinder who is able to view the demeanors, gestures, and inflections of the various witnesses. See id.
If we were permitted to gauge the credibility of witnesses in a civil trial, nothing in the record would spur us to disagree with the trial court's determination in this case. Cornett's version of events was no less credible than Rudd's. Indeed, as appellees have suggested, the notion that Rudd would be moved by Cornett's threats of suicide on one day, and then fly off to California on the next, stands itself at the limits of believability.
Because the trial court's determination that Rudd did not act under duress was supported by some competent evidence, we must reject Rudd's duress argument on appeal. Having done so, we have now addressed all arguments advanced by Rudd in support of his assignment of error. For the reasons expressed above, we overrule appellant's sole assignment of error. The trial court's declaratory-judgment determination that Rudd is no longer a shareholder in Online Resources is hereby affirmed.
Judgment affirmed.
FAIN, J., and YOUNG, J., concur.
Copies mailed to:
Hans H. Soltau
Karl R. Ulrich
Harry G. Beyoglides, Jr.
Hon. Jeffrey Froelich