BIG LOTS STORES, INC.,
Plaintiff–Appellee,

v.

JAREDCO, INC. and Barry Sussman,
Defendants–Appellants.

Nos. 02–3686, 02–3718, 03–3404.

United States Court of Appeals,
Sixth Circuit.

May 19, 2004.

Bruce L. Ingram, Joseph R. Miller, Vorys, Sater, Seymour & Pease, Columbus, OH, for Plaintiff–Appellee.

Max Kravitz, Kort W. Gatterdam, Kravitz & Kravitz, Columbus, OH, for Appellant.

Ronald B. Noga, Weltman, Weinberg & Reis, Columbus, OH, for Defendant–Appellant.

Before MERRITT and MOORE, Circuit Judges; and DUGGAN,* District Judge.

MERRITT, Circuit Judge.

This case arose from negotiations between Big Lots Stores, Inc. ("Big Lots"), a retailer, and Jaredco, Inc., d/b/a Goldman & Company ("Goldman"), a collection agency, for the sale from Big Lots to Goldman of approximately 34,000 insuffi-

* The Honorable Patrick J. Duggan, United States District Judge for the Eastern District of Michigan, sitting by designation.

cient-funds checks with a combined face value of about $2.7 million. Goldman began collecting on the checks in violation of an agreement with Big Lots not to do so absent a written agreement for the sale of the checks, and Big Lots sued Goldman for conversion and breach of contract. Big Lots prevailed, and Goldman now appeals the calculation of compensatory damages. Goldman's president. Barry Sussman, also appeals the district court's denial of his motion to intervene in his personal capacity.

## I.  Facts and Procedural History

In the summer of 2001, Big Lots sent an electronic file of bad checks to Goldman for the purpose of allowing Goldman to decide whether or not it wanted to purchase the checks and for what price. Goldman signed a confidentiality agreement with Big Lots promising to use the file only for the purpose of evaluating the value of the checks for a potential bid. and not to use the data for any other purpose unless and until the parties executed a written agreement for the sale of the checks. Eventually, Goldman submitted a bid to Big Lots for $110.000 for the checks. Big Lots never responded to that offer.

At some point Goldman received some phone calls from some Big Lots customers wishing to settle their checks. A recording at Big Lots was directing customers to Goldman or two other companies, perhaps because Goldman had done some collections for Big Lots in the past. Based on that fact Goldman took the position that Big Lots had accepted its offer of $110,000 for the bad checks. It wrote to Big Lots to inform Big Lots that it would begin collection efforts. At about the time that Big Lots received that notice from Goldman, it also began to receive complaints from customers who claimed that Goldman had been harassing them in various abusive and threatening ways. For example,

a Goldman collector would call a customer, demand that the customer pay for her check plus a $125.00 fee (even though many of the checks were of a much smaller amount), and tell them (sometimes shouting at them) that the sheriff would be coming to arrest them if they did not pay the amount demanded. Big Lots immediately insisted that Goldman cease its collection efforts, but Goldman refused.

At Big Lots' request, the Court of Common Pleas for Franklin County, Ohio, issued a temporary restraining order on August 24, 2001, ordering Goldman to cease collection efforts. Big Lots also sought damages for breach of the confidentiality agreement and conversion of the electronic file, and the defendant removed the case to federal court. The federal district court extended the temporary restraining order, and on September 26, 2001, granted a Preliminary Injunction in favor of Big Lots. During the Preliminary Injunction hearing, the district court learned that Goldman had violated the court's temporary restraining order by continuing to call check writers. In two subsequent hearings, the court fined Goldman $20,000 for contempt and on November 28, 2001, ordered Goldman to post a bond or open an escrow account in the amount of $153,986.05 to compensate Big Lots for damages incurred as a result of Goldman's violation of the temporary restraining order.

On December 10, 2001, Big Lots filed a notice with the district court that Goldman had failed to post the bond as ordered in November. On January 16, 2002, the district court held a telephone status conference to determine why the order had not been complied with. The attorney for Goldman claimed that Goldman did not have sufficient assets to cover the bond, and that Goldman was going out of business. Big Lots pointed out that Goldman had not filed for bankruptcy or shown in

any way that it was insolvent. The court warned that a company must do whatever is necessary to comply with the court order, and asked why Barry Sussman, Goldman's president, did not offer a personal guarantee. The court eventually, on March 14, 2002, scheduled a hearing for April 17, 2002, to show cause why Sussman should not be held in contempt for Goldman's failure to abide by the order. On the day of that hearing Goldman opened an escrow account in its name with National City Bank and issued a check in its name for $153,986.05 to be placed in its name in the escrow account, and a check in its name for $12,595.00 to pay Big Lots' attorneys' fees incurred as a result of its violation of the temporary restraining order.

Meanwhile, as to the merits of the underlying suit against Goldman, on January 30, 2002, the district court granted summary judgment to Big Lots on its claim for breach of the confidentiality agreement and conversion of the electronic file. On April 30, 2002, the court conducted a bench trial to determine the amount of damages. On May 24, 2002, the court awarded damages to Big Lots in the amount of $901,800.00, including the $153,986.05 already in escrow, which it ordered be released to Big Lots. Finally, on June 12, 2002. Barry Sussman sought to intervene in the case, but the district court denied his motion. Goldman and Sussman filed a consolidated appeal. They do not contest the finding of liability on summary judgment, but rather appeal the calculation of the compensatory damages and the denial of Sussman's motion to intervene. For the reasons stated below, both rulings are AFFIRMED.

II. The District Court Did Not Commit Reversible Error in its Calculation of Damages

■ Since this is a diversity case, damages are to be measured according to Ohio law. In Ohio, damages for conversion are measured by "the value of the converted property at the time of the conversion." *Brumm v. McDonald & Co. Securities, Inc.*, 78 Ohio App.3d 96, 603 N.E.2d 1141, 1146 (1992). Goldman does not dispute that the measure of damages in Ohio conversion cases such as this one is the market value of the property at the time of conversion, but does argue that the damage award in this case is clearly erroneous and speculative. In fact, the district court's ruling was based on a careful consideration of the evidence and is not clearly erroneous, but instead is "reasonably within the range of proofs in the case." *Drayton v. Jiffee Chem. Corp.*, 591 F.2d 352, 366 (6th Cir.1978).

The district court arrived at the $901.800.00 amount as the "market value" of the check file by calculating the amount Goldman might have reasonably expected to receive from the file. Based on testimony by Mr. Sussman, Goldman's president, the court determined that Goldman would probably be able to collect 10% of the face value of the checks, or $270,000. See App. at 57–61. In addition to the face value Goldman collected it also typically collected fees above the face amount of the checks. For example, it does not appear to be contested that in the first two months of collections Goldman obtained $62,076.72 in principal on the checks plus 3.34 times that amount in fees, for a total of $207,087.61. Therefore to determine the value of the file, the district court figured in not only the $270,000 (10% of the face value of the checks), but also an additional 3.34 times that amount, for a total of $901.800.00. In doing so it rejected arguments from Big Lots that the checks were worth 50% of their face value ($1.35 million), and from Goldman that the checks were worth nothing, or perhaps

only $51,065.86. or at most the $110.000 Goldman had offered to pay for them.

Goldman offers several objections to the district court's calculation, none of which are convincing. First, it argues that the district court's calculation is clearly erroneous because the court failed to consider "the mitigating factors of its own order" in that Goldman only used the electronic file for two months because of the district court's restraining order preventing further collections. Thus the district court's calculation of damages "based on a total conversion" of the electronic file, Goldman argues, is clearly erroneous. In support of this argument Goldman cites a nineteenth century United States Supreme Court case (even though the instant case is governed by Ohio law) for the principle that conversion damages should be mitigated when the converted property is returned "essentially uninjured." *Colby v. Reed,* 99 U.S. 560, 25 L.Ed. 484 (1878). Here the file was "injured." There was evidence in this case that the file in question was substantially injured through Goldman's conduct. Goldman's own counsel asserted during a previous hearing that the starting and stopping of collection efforts harms collection and that protracted delay in such efforts renders a file worthless. App. at 170–172. The value of the file was even more likely injured in this case because of the abusive behavior of Goldman's collection agents towards Big Lots' customers. Although the district court did not discuss this argument in its opinion, there was ample evidence for it to conclude that the lot of bad checks were not "essentially uninjured," and the decision not to mitigate the damages was therefore not clearly erroneous.

Goldman also argues that the district court's calculation of damages was clearly erroneous because it constituted a windfall to Big Lots through its inclusion of the additional fees Goldman typically collected, and through its failure to deduct for the collection expenses that Goldman would have incurred. This argument is misguided as well. Just because Goldman is typically able to collect fees in addition to the face value of checks does not mean that those fees are not part of the market value of the checks, and Goldman cites no cases that suggest otherwise. Goldman claims that such fees could only result from Goldman's collection efforts and thus constitute not the market value of the checks, but instead "value added" by Goldman. But there is no reason to think that Big Lots could not have collected fees itself or sold the checks to a different collection agency that might pay a premium for the potential fees. It is reasonable to think that the market value of the checks would reflect the potential to collect fees in addition to principal, and Goldman has no monopoly on the ability to do so. The district court's calculation that the checks were worth a fraction of the face value plus a premium on that fraction to reflect potential fees is not unreasonable.

Goldman's claim that the market value of the checks should be discounted for the costs of collections is likewise specious, and again Goldman cites no cases for its support. On the contrary, according to Ohio law such costs can be discounted when the property is converted "innocently." but they will not be deducted when it was converted "knowingly and willfully." *Brady v. Stafford.* 115 Ohio St. 67, 152 N.E. 188, 192 (1926) (distinguishing the conversion of coal due to a "mistaken idea of right," which is measured by the lower *in situ* value, from intentional conversion of coal, which is measured by the value of the coal after it has been mined). In this case, although the district court did not find the level of malice necessary to support Big Lots' punitive damages request, in its written opinion it did find that Goldman had

acted "in less than good faith." App. at 62. At the damages hearing it also found that Goldman's conduct "was not unintentional," and that Goldman had engaged in a "risk-benefit analysis" by breaching the Confidentiality Agreement and converting the check file. App. at 423.

Goldman also points to its initial offer of $110,000 for the checks as evidence of their market value. The district court was correct to give little regard to the $110,000 offer by Goldman as evidence of the value of the checks. Big Lots never accepted the offer or even responded to it, and there is no reason to think that the amount was anything more than an opening bid in what would likely have been a protracted negotiation process. Indeed, in the first two months alone Goldman collected over $200,000 from the file.

The district court's calculation of damages was not unreasonable but is instead well "within the range of proofs in the case." *Drayton,* 591 F.2d at 366. It should therefore be upheld.

### III. The District Court's Denial of Barry Sussman's Motion to Intervene Is Also Upheld

■ To intervene as of right pursuant to Federal Rule 24(a)(2). a party must meet a four-part test. He must "demonstrate (a) that he has an interest in the property or transaction that is the subject matter of the litigation; (b) that the disposition of the action as a practical matter may impair or impede his ability to protect that interest; and (c) that parties already in the litigation cannot adequately protect that interest." *Triax Co. v. TRW, Inc.,* 724 F.2d 1224, 1227 (6th Cir.1984). In addition, the motion must be filed in a timely manner. *Id.* The district court denied Sussman's motion to intervene on the grounds that he has no interest in the litigation.

Although Sussman claims to have supplied personally the $153,986.05 in the escrow account, he offered no evidence to that effect, as the district court pointed out. Sussman personally appeared at the show cause hearing and handed over a check, but as president of the company it would be expected that he would do so on behalf of the company. There is no evidence that the money was provided by Sussman personally, and in fact the money was written against a company account and placed in an escrow account in the company's name. We should not assume Sussman's claims to be true in the absence of any proof whatsoever.

We also conclude that Sussman's motion was untimely. In considering whether a motion to intervene is timely, a court must consider five factors:

(1) the point to which the lawsuit has progressed; (2) the purpose for which the intervention is sought; (3) the length of time preceding the application during which the proposed intervener knew or reasonably should have known of the interest in the case; (4) the prejudice to the original parties due to the proposed intervener's failure, after he or she knew or reasonably should have known of his interest in the case, to apply promptly for intervention; and (5) the existence of unusual circumstances militating against or in favor of intervention.

*Jordan v. Michigan Conf. of Teamsters Welfare Fund.* 207 F.3d 854, 862 (6th Cir. 2000). None of these factors support Sussman's intervention.

The circumstances mitigate against intervention. Sussman only sought to intervene after the verdict against Goldman and after a damage award had been ordered—in effect, after the case was over. Goldman, with Sussman as its president, not only violated its agreement with Big

Lots, it also was held in contempt of court for violating the court's restraining order. While Goldman went out of business and claimed an inability to pay the bond, Mr. Sussman, Goldman's sole shareholder, opened a new collection agency under a different name but with the same employees and in the same vicinity.

Sussman was undoubtedly aware of whatever interest he had in the case long before June 12, 2002, when he sought to intervene. He placed the money in escrow on behalf of the company on April 17, 2002. The district court asked him about posting a bond personally as early as January 16, 2002. On January 30, 2002, the district court granted summary judgment for Big Lots. The point of the escrow account from the beginning was to preserve money collected by Goldman in violation of the restraining order in the event that Big Lots prevailed on its claim for conversion. Even if the order had been complied with right away (i.e., before the judgment against Goldman on the merits) everyone involved would have been on notice that Goldman was in danger of losing at least the money in escrow, and possibly much more. By the time Goldman complied with the order, it had already lost the underlying conversion case and was faced with almost certainly having to pay back *at least* the over $200,000 it had already collected from Big Lots' customers. If Sussman believed that he had a legal claim to the money Goldman placed into escrow in April, he should have protested when he presented the check. Sussman's argument that he had no reason to intervene until the May 28, 2002, order awarding damages to Big Lots and releasing the money from escrow cannot be taken seriously.

For the reasons stated above, this Court AFFIRMS the district court's award of damages in the amount of $901,800.00 to Big Lots, and AFFIRMS the district

court's denial of Barry Sussman's motion to intervene.