[Cite as *Qualls v. Wright Patt Credit Union*, 2021-Ohio-2055.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**GREENE COUNTY**

| | | |
|---|---|---|
| DEVYN QUALLS | : | |
| | : | |
| Plaintiff-Appellant | : | Appellate Case No. 2020-CA-48 |
| | : | |
| v. | : | Trial Court Case No. 2019-CV-788 |
| | : | |
| WRIGHT PATT CREDIT UNION | : | (Civil Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellee | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 18th day of June, 2021.

. . . . . . . . . . .

STUART E. SCOTT, Atty. Reg. No. 0064834 & KEVIN C. HULICK, Atty. Reg. No. 0093921, 1001 Lakeside Avenue East, Suite 1700, Cleveland, Ohio 44114
      Attorneys for Plaintiff-Appellant

JAMES R. BRANIT, Atty. Reg. No. 0002311, 303 West Madison Street, Suite 300, Chicago, Illinois 60606 & DANIEL C. GIBSON, Atty. Reg. No. 80129, 100 South Third Street, Columbus, Ohio 43215
      Attorneys for Defendant-Appellee

. . . . . . . . . . . .

DONOVAN, J.

{¶ 1} Devyn Qualls appeals from the November 19, 2020 order of the trial court to

stay his claims against Wright-Patt Credit Union ("WPCU") pending arbitration. We will affirm the judgment of the trial court.

{¶ 2} Qualls filed a class action complaint against WPCU on December 4, 2019, asserting that he and others similarly situated to him had been charged "multiple Non-Sufficient Funds Fees" (NSF fees) on a single transaction. The complaint asserted that such charges were in violation of the parties' contract and "reasonable consumer understanding." According to the complaint, WPCU often charged more than one $25 NSF fee on the same transaction, even though the contract stated and reasonable consumers would have understood that a single transaction would incur only one NSF Fee. The complaint asserted that WPCU's deposit agreement did not disclose this practice and, in fact, indicated that it would not undertake this practice. Qualls asserted that he had used his Discover card to make a $50 payment on September 26, 2016, and that the payment was twice rejected for insufficient funds, leading to $50 in NSF fees instead of one $25 fee.

{¶ 3} Qualls' first claim was for breach of contract, including breach of the covenant of good faith and fair dealing; he asserted that he (and fellow members of the class) had contracted with WPCU for bank account deposit and checking services, as reflected in WPCU's Deposit Agreement and related documents.

{¶ 4} Qualls' second claim was for fraud regarding the charging of multiple NSF fees. Attached to the complaint as Exhibit A was a booklet entitled "Important Account Information," which had an effective date of February 2019; the booklet included a Membership and Account Agreement ("Membership Agreement"), an Electronic Fund Transfer Disclosure, a Funds Availability Disclosure, and a Privacy Policy. Section 3 of

the Membership Agreement provided: "If you have a dispute with the Credit Union and we are not able to resolve the dispute informally, you agree the dispute will be resolved through an arbitration process further detailed in the Dispute Resolution section" of the Membership Agreement; that section also provided that, if a claim were eligible to be resolved in small claims court, the member could pursue it in small claims court. However, there was no "Dispute Resolution section" in the Membership Agreement. Exhibit B was a General Fee Schedule, which reflected a $25 NSF fee "per item, created by check, ACH (Electronic Item), or other."

{¶ 5} The same day as he filed his complaint, Qualls filed a motion for class certification; he subsequently filed a motion to stay his motion for class certification pending discovery, and the court granted the motion.

{¶ 6} In January 2020, WPCU notified Qualls that, pursuant to R.C. 2711.03, it intended to petition the court for enforcement of the mandatory arbitration provision of the Membership Agreement if Qualls did not voluntarily dismiss his claims and initiate the arbitration process himself. WPCU also asked the court for a brief extension of time to move or plead in response to the complaint "to allow for the demand and response process to conclude." The court granted the motion. In February 14, 2020, the parties filed agreed motions to extend WPCU's time to respond to the complaint and setting an arbitration discovery and briefing schedule.

{¶ 7} On May 6, 2020, WPCU filed a notice regarding the arbitration discovery and briefing schedule, and on July 15, 2020, Qualls filed a motion for a case management conference.

{¶ 8} On July 20, 2020, WPCU filed a motion to dismiss or, in the alternative, an

application for a stay pending arbitration. WPCU asserted that Qualls' action was subject to dismissal due to his "failure to initiate the arbitration procedures" set forth in the parties' agreement. Alternatively, WPCU asserted that, pursuant to R.C. 2711.02, the court should stay the action until the arbitration of Qualls' claims was completed.

{¶ 9} According to WPCU, Qualls admitted in his complaint that the applicable Membership Agreement provided that any dispute would be resolved through arbitration, and he had agreed to be bound by WPCU's Articles of Incorporation and Code of Regulations and the terms and conditions of the Membership Agreement and any subsequent amendments to the Membership Agreement. WPCU asserted that the Membership Agreement permitted WPCU to "change the terms of this Agreement and the other Account Documents at any time" and to notify members of any changes in terms, rates, or fees as required by law. WPCU also pointed out that the Membership Agreement stated that any amendment to the Membership Agreement governed over prior versions of the agreement.

{¶ 10} WPCU asserted that, on July 31, 2019, it had posted on its website the July 2019 Membership Agreement, and that on August 12, 2019, it had mailed the July 2019 Membership Agreement to Qualls' mother, Natalie Qualls, at the same mailing address Qualls had provided to WPCU as his mailing address. WPCU stated that, at the time, Natalie Qualls had been pursuing a claim against WPCU based on the same theory as Qualls' theory in this case, and she was represented by the same attorneys who represent Qualls in his action against WPCU.

{¶ 11} WPCU also asserted that the July 2019 Membership Agreement established a dispute resolution procedure at Section 8.25 and "defined how WPCU

members, including Qualls, would accept its terms," namely by maintaining their accounts; Qualls continued to maintain his WPCU account. According to WPCU, Qualls had also registered for online banking on August 31, 2015, and in doing so, he had consented to the terms of WPCU's online banking agreement. WPCU asserted that the terms of the online banking agreement were incorporated into the Membership Agreement.

{¶ 12} WPCU argued that its "continuous and regular practice" was to maintain on its website the current version of the Membership Agreement and Account Documents; accordingly, from July 31, 2019 to June 30, 2020, the Membership Agreement displayed on the WPCU website under the tab "Helpful Resources/Disclosures" had included the arbitration provision set forth in Section 8.25. WPCU argued that "the online banking agreement also included * * * an arbitration and class action waiver provision."

{¶ 13} WPCU asserted that "applicable law favors and indeed requires arbitration," and that courts "have uniformly found arbitration provisions containing a class action waiver to be valid and consistent with public policy." WPCU argued that, according to the U.S. Supreme Court, parties are free to agree to preclude class actions in arbitration, and that class action waivers are valid and enforceable under Ohio law. Accordingly, WPCU argued that Qualls had "no policy defense" against the requirement that he arbitrate his claims on an individual basis.

{¶ 14} WPCU asserted that Qualls had admitted the requirement that he arbitrate his dispute with WPCU in that he attached the February 2019 Membership Agreement to his complaint, claiming it was binding on the parties, and that agreement contained simple, enforceable arbitration provisions. Moreover, WPCU clarified the arbitration

provisions of the February 2019 Membership in the July 31, 2019 version of the Membership Agreement, before Qualls asserted any dispute. Therefore, according to WPCU, the contract under which Qualls sued WPCU included an arbitration agreement.

{¶ 15} WPCU argued that, when Qualls became a member of WPCU, he gave advance assent to any modifications WPCU might make to the Membership Agreement in the future; in other words, WPCU asserted that Qualls "gave WPCU his prior consent" as soon as he became a member to make changes without giving him any prior notice of such changes, and that such a contractual provision "whereby one party gives the other party the right to change the terms unilaterally is valid and binding under Ohio law." WPCU also argued that it was undisputed that Qualls had "constructive or inquiry notice" of the provisions of the July 2019 Membership Agreement, because he "undertook the obligation of inquiry" and agreed to "electronically view any changes in disclosures, election information, or updates to WPCU products, services, and fees" pursuant to the terms of the online banking agreement. WPCU also noted that Qualls "regularly and frequently" visited its website and used online banking. WPCU argued that by continuing to maintain his account after the effective date of the July 2019 Membership Agreement, Qualls "objectively manifested his assent to the terms of the arbitration provision."

{¶ 16} WPCU argued that Qualls' claims fell within the scope of the arbitration agreement, that the July 2019 Membership Agreement governed his claims, and that allowing Qualls' case to proceed in court would undermine the parties' agreement and their "legitimate expectations." Finally, WPCU argued that Qualls was required to "pursue this claim on an individual basis in arbitration," not as a class action.

{¶ 17} WPCU attached to its motion an affidavit from Kim Riley, Vice President of

Service Delivery for WPCU, and "Group Exhibit 1," which contained two booklets entitled "Important Account Information" including the July 2019 Membership Agreement. The booklets were identified as Version 1 and Version 2. Riley averred that policies contained therein were applicable to Qualls' account between July 31, 2019 and June 20, 2020. Riley's affidavit stated that the two versions of the July 2019 Membership Agreement in Group Exhibit 1 contained identical terms (with the exception that Section 4, "How We Handle Your Personal Information" was shorter in Version 1). Also attached as exhibits were the WPCU Internet Access Agreement, Optional Bill Pay Agreement and Disclosure Statement (Exhibit 2) and a document detailing Qualls' visits to online banking (Exhibit 3), which Riley said was a "true and accurate copy of a record kept by WPCU in the regular and ordinary course of business pursuant to regular and reliable means."

{¶ 18} On July 30, 2020, Qualls requested an extension of time to respond to the motion to dismiss, and he filed his response on October 2, 2020. Qualls asserted that the parties never entered into an agreement to arbitrate and that the lack of notice precluded a meeting of the minds regarding the February 2019 and July 2019 Membership Agreements. Qualls asserted that he did not have actual notice of modifications to the Membership Agreements, and that he was not obligated to review the WPCU website for modifications to the Membership Agreements. According to Qualls, the December 2014 Membership Agreement and all subsequent Membership Agreements did not permit WPCU to add an arbitration provision. Qualls directed the court's attention to *Maestle v. Best Buy Co.*, 8th Dist. Cuyahoga No. 79827, 2005-Ohio-4120, ¶ 20, which purportedly held that a party "with a unilateral right to modify a contract [does not have] the right to make any kind of change whatsoever . . . ')." Qualls argued

that the "stray reference" to arbitration in the February 2019 Membership Agreement was unenforceable. Finally, he argued that the July 2019 Membership Agreement was unenforceable and procedurally and substantively unconscionable.

{¶ 19} Qualls' affidavit was attached to his response. Qualls averred that he became a member of WPCU on March 24, 2015, while in high school and that he had never been allowed to negotiate "any terms of the Important Account Information," including the Membership Agreement contained in that document. According to Qualls, the Membership Agreement containing the arbitration provision that WPCU sought to enforce was "non-negotiable" and he was not informed by WPCU of its addition of an arbitration provision in 2019. Qualls further averred as follows:

> As part of my preparation for making this declaration, I read the Dispute Resolution and Exhaustion of Administrative Remedies section of the July 2019 Membership Agreement that [WPCU] claims governs this dispute. The document includes a substantial amount of "legalese" that I have difficulty understanding * * *. I had never seen that provision until reading it in the context of this lawsuit.

{¶ 20} Noting that the arbitration provision imposed half of the costs of arbitration on him regardless of the outcome, and that he could be liable for WPCU's attorney fees as well, Qualls averred that pursuing arbitration could "present an enormous financial hardship" for him. He also stated that he would be "greatly harmed" if his lawsuit were sent to arbitration and would be "forced" to drop his claims against WPCU despite its improper conduct in charging certain fees to his account.

{¶ 21} Qualls' response to the motion to dismiss included a "declaration" from Mark

A. Clifford, an associate at the law firm of Tycko & Zavareei, LLP, which represented Qualls. Attached to the Declaration were the following exhibits: the December 2014 version of WPCU's Membership Agreement (Exhibit A); the January 2018 version of the Membership Agreement (Exhibit B); the February 2019 version of the Membership Agreement (Exhibit C); excerpts of the transcript of the September 9, 2020, deposition of Kim Riley (Exhibit D); the July 2019 (Version 1) version of the Membership Agreement (Exhibit E); WPCU's answers to interrogatories dated May 5, 2020 (Exhibit F); WPCU's Internet Account Access Agreement (Exhibit G); a Google Analytics report of traffic to the WPCU website (Exhibit H), and screenshots of the WPCU website (Exhibit I). (WPCU noted that the two versions of the July 2019 Membership Agreement were identical in all relevant respects, so only Version 1 was attached.)

{¶ 22} Clifford's declaration stated:

14. As reflected in Exhibit A, the December 2014 Membership Agreement contains no reference to arbitration or alternative dispute resolution. The same is true for the June 2015 and December 2015 Membership Agreements.

15. As reflected in Exhibit B, the January 2018 Membership Agreement contains a stray reference to a non-existent dispute resolution in Section 3. The same language (and absence of a dispute resolution section) is also found in the February 2019 Membership Agreement (as reflected in Exhibit C), the May 2019 Membership Agreement, and the June 2019 Membership Agreement.

16. On May 14, 2019, Plaintiff's mother, Natalie Qualls, filed a class

action complaint against WPCU in the United States District Court for the Southern District of Ohio, raising substantially similar claims that Plaintiff brings in the present action. Natalie Qualls brought claims on behalf of herself and * * * proposed classes of consumers including, *inter alia*, "All WPCU checking account holders in the United States who, during the applicable statute of limitations, were charged multiple NSF Fees on the same item" and "All WPCU checking account holders in Ohio who, during the applicable statute of limitations, were charged multiple NSF Fees on the same item." *See Qualls et al. v. Wright-Patt Credit Union, Inc.*, Case No. 2:19-CV-01965-ALM-KAJ (S.D. Oh. May 14, 2019), Dkt. No. 1 (Complaint). Mr. Qualls was a member of both of these proposed classes.

17. Natalie Qualls voluntarily dismissed her case in the Southern District of Ohio on August 8, 2019. She then filed a complaint in the Court of Common Pleas for Greene County on September 18, 2019, again asserting claims that are substantially similar to those Plaintiff brings in the present action and seeking to represent classes of WPCU checking account holders in Ohio who were charged multiple NSF fees on the same item. *See Qualls et al. v. Wright-Patt Credit Union, Inc.*, Case No. 2019 CV 0603 (Greene Cty. Ct. Common Pleas). Again, Mr. Qualls was a member of these proposed classes.

18. On December 16, 2019, Natalie Qualls voluntarily dismissed her case against WPCU pending before this court, almost two weeks after Plaintiff filed his Complaint in the present action.

{¶ 23} WPCU filed a reply on October 19, 2020.  WPCU asserted that "not only does the contract [Qualls] is suing on require arbitration, WPCU also supplemented the arbitration provision pursuant to its previously agreed-upon authority to periodically amend the Membership Agreement, and it provided [Qualls] with notice of the amendment both through its website as previously-agreed upon and through his attorneys."  WPCU asserted that neither the February 2019 Membership Agreement nor July 2019 Membership Agreement was unenforceable, because Qualls was on notice that all disputes required resolution through arbitration and failed to demonstrate that the July 2019 Membership Agreement was unconscionable.  WPCU asserted that Qualls "cannot ignore his contractual duty to inquire into the arbitration requirements nor can he properly refute that actual notice was imputed to his attorneys."

{¶ 24} WPCU reiterated that Qualls had admitted in his complaint that the February 2019 Membership Agreement was the applicable contract and was binding on the parties, and it argued that he could not sue on a contract and also claim that he was not bound by terms of that contract that he did not like.  WPCU asserted that the February 2019 Membership Agreement consisted of "contractually agreed upon terms of the parties."

{¶ 25} WPCU argued that, although Qualls asserted that he could not have agreed to the 2017 online banking agreement because he first enrolled in online banking in 2015, in fact, the online banking agreement advised Qualls that he agreed to the terms of the online banking agreement "as amended from time to time by using online banking." WPCU asserted that Qualls frequently utilized online banking, and that he did not dispute that the online banking agreement was in effect in 2019 when the applicable arbitration provision was added.  WPCU asserted that, pursuant to the language in the online

banking agreement, Qualls "contractually obligated himself to 'electronically view' changes" in the Membership Agreement.

{¶ 26} WPCU argued that the reference to "electronic delivery," upon which Qualls relies, pertained only to the online banking agreement in which it appeared and, as specified, the electronic funds transfer disclosure, and that neither WPCU nor Qualls ever agreed to electronically deliver updates to the Membership Agreement. According to WPCU, Qualls undertook an explicit duty to electronically view any changes to the Membership Agreement by enrolling in online banking and through his continued use of online banking. WPCU also asserts that Qualls received actual notice of the July 2019 Membership Agreement because it was "imputed to his counsel by way of their representation of his mother in a nearly-identical lawsuit," which "essentially bars [his] action in the current forum." WPCU argued that Qualls' attorneys "came to [him] with full knowledge of the existence of the July 2019 arbitration provision."

{¶ 27} Further, WPCU asserts that nothing in the December 2014 Membership Agreement – or any subsequent agreements – precluded WPCU from adding an arbitration provision. In fact, the language of the agreements explicitly advised members that WPCU could change the terms at any time. According to WPCU, if a member "took issue with any added term, it could terminate its relationship with WPCU," but if it continued to maintain an account, as Qualls did, the member accepted any change in terms.

{¶ 28} WPCU distinguished the case cited by Qualls, *Maestle v. Best Buy Co.*, 8th Dist. Cuyahoga No. 79827, 2005-Ohio-4120, on the basis that the contract at issue in that case identified specific areas that could be amended be referencing "only changes to

payments, charges, fees and interests. " The court held that, due to this limitation, a customer could not have anticipated that the credit card company would amend the contract to add an arbitration clause. WPCU argued that, contrary to the limitations in *Maestle,* the WPCU Membership Agreement specifically gave it the unrestricted ability to change the terms of the agreement. WPCU also argued that *Maestle* was "entirely inapplicable" to its dispute with Qualls because *Maestle* did not "purport to change the axiomatic law that the parties can amend a contract at any time to add new terms if there is [an] offer, acceptance, and consideration." WPCU argued that, here, there was an offer based on actual and constructive notice, there was acceptance by continued use of the account, and there was consideration (both in a mutual requirement of arbitration and in the continuing underlying consideration for the membership as a whole). Because *Maestle* did not negate the ability of the parties to amend a contract, but merely stated that one side cannot unilaterally add a new provision "based solely on a 'change in terms' provision when there is not [an] offer, acceptance, or consideration," WPCU argues that it was not limited in the changes it could make to the December 2014 or subsequent Membership Agreements.

{¶ 29} WPCU argued that Qualls did not contest two fundamental facts: that the February 2019 and July 2019 Membership Agreements contained arbitration clauses and that Qualls had agreed to any and all revisions to the Membership Agreement. According to WPCU, these facts were sufficient to compel arbitration; moreover, the February 2019 Membership Agreement advised Qualls that any disputes would be resolved through arbitration, and "statutory and case law make it clear that an agreement that indicates a clear intent to arbitrate will be enforced, even if the agreement contains

no particular procedures or forum for the arbitration." WPCU argued that, because the February 2019 Membership Agreement included an Ohio choice of law clause, the procedures found in the Ohio Arbitration Act (R.C. Chapter 2711) regarding arbitration "applied to fill in the procedures for arbitration."

{¶ 30} According to WPCU, Qualls failed to establish that the arbitration provision in the July 2019 Membership Agreement was procedurally or substantively unconscionable. It argues that there was nothing procedurally unconscionable about the amendment to the agreement because Qualls had agreed that WPCU could amend the terms. WPCU further asserted that arbitration was referenced at least two times in the July 2019 Membership Agreement –in Paragraph 3 discussing dispute resolution and again in detail in Paragraph 8.25 discussing the process. WPCU asserted that if Qualls did not understand the terms after reading the Membership Agreement, "the onus was on him, not WPCU, to ensure that he did." WPCU also points out that Qualls admitted he had never read the July 2019 Membership Agreement. Finally, WPCU asserted that, while Qualls argues that the arbitration provision was procedurally unconscionable "because it was implemented during active litigation in which [he] was a putative class member," his position ignored the fact that a valid agreement to arbitrate existed not later than February 2019, before the filing of other litigation in May 2019, "which exempted [Qualls] from being putative class member in another action." According to WPCU, "not only was [Qualls] not a putative class member in that action by way of the February 2019 arbitration provision, but no putative class existed as of August 8, 2019," when the lawsuit in which he claimed to be a class member was dismissed.

{¶ 31} Regarding substantive unconscionability, WPCU argued that Qualls' "vague

conclusion" that arbitration costs would be "significantly higher" has been "routinely rejected by Ohio courts." Qualls provided no evidence of the expected cost differential between arbitration and litigation in court, and his contention that his attorneys' fees for litigation were "nothing" and he would be required to hire a new attorney for arbitration were "insufficient"; these arguments also ignored the "significant costs WPCU would incur if it were forced to litigate his claim," which it would ultimately have to pass along to its members. In any event, according to WPCU, high costs do not equate to substantive unconscionability. Finally, it asserted that "even if one of these clauses were supposedly unconscionable, the appropriate remedy would be to sever it from the arbitration provision – not invalidate it from the arbitration provision."

{¶ 32} In its decision, the trial court granted a stay, concluding that arbitration was required by the parties' agreement. It stated:

> This action arises out of Qualls's allegation that [WPCU] assessed multiple Non-Sufficient Funds fees on the same transaction. Qualls has asserted causes of action for breach of contract, including breach of the covenant of good faith and fair dealing and fraud regarding multiple non-sufficient funds fees. Qualls specifically alleges that [WPCU] "breached the terms of its contract, the Deposit Agreement and related documentation." (Complaint ¶ 63). The "contract, Deposit Agreement and related documentation" that Qualls alleges [were] breached is the Important Account Information effective in February, 2019. Section 3 of the document contains the heading "Reporting Errors and Dispute Resolution" and provides:

"If you have a dispute with the Credit Union and we are not able to resolve the dispute informally, you agree that the dispute will be resolved through an arbitration process further detailed in the Dispute Resolution section of the Account Agreement. If a claim is eligible to be resolved in small claims court, you may pursue the claim in small claims court." (Complaint Exhibit A, p. 5).

Applying the above principles of law, the language of the agreement is clear – any claim that cannot be resolved informally and that is not eligible to be resolved in small claims court is to be resolved through arbitration. Moreover, the Second District Court of Appeals has upheld a trial court's referral to arbitration in a case that involved an agreement with similar language. *See W.K. v. Farrell,* [167 Ohio App.3d 14, 2006-Ohio-2676, 853 N.E.2d 728 (2d Dist.).] Therefore, in accordance with R.C. 2711.02(B), the Court is satisfied that the issues presented are referable to arbitration under the terms of the Membership and Account Agreement and hereby stays the trial of this action until the arbitration of the issues herein has been had.

{¶ 33} Qualls appeals from the trial court's order, raising one assignment of error:

THE TRIAL COURT ERRED BY GRANTING WPCU'S MOTION TO COMPEL ARBITRATION.

{¶ 34} Qualls asserts that WPCU did not establish that an agreement to arbitrate existed, and therefore that the trial court should not have required arbitration. He characterizes WPCU's evidence as "a stray reference to a *non-existent* Dispute Resolution Section in the February 2019" Membership Agreement and "a unilateral

modification" in the July 2019 Membership Agreement, which purported to impose a new and unconscionable arbitration provision many years after he opened his account, without notice to him or his consent. Qualls asserts that the trial court "offered only a cursory two-sentence analysis of the February 2019 Membership Agreement, relying on a single inapposite case," and it did not address his argument that there was never any agreement to arbitrate. Qualls further asserts that the trial court "ignored entirely the threshold issues of whether (1) WPCU was permitted to unilaterally add an arbitration provision to the Membership Agreement; and (2) whether Mr. Qualls ever agreed to or received the purported arbitration provision in the February 2019 Membership Agreement (as would be required to assent to its terms)." Qualls argues that the reference to arbitration in February 2019 Membership Agreement was not enforceable because it referred to a Dispute Resolution Section that did not exist, and the July 2019 Membership Agreement did not "provide an alternative basis for upholding the Order."

{¶ 35} Qualls further argues that the trial court declined to apply contract principles "and analyze whether the parties ever formed a contract to arbitrate." Regarding WPCU's argument that he was bound by the Membership Agreement attached to his complaint, Qualls asserts that the question of whether the Membership Agreement was a valid contract for purposes of Qualls' breach of contract claims was separate and distinct from whether a separate contract to arbitrate was formed by WPCU's attempted unilateral addition of the arbitration provision. He argues that his "breach of contract claim is based on language pertaining to NSF Fees (a term of the Membership Agreement, not a separate 'contract within a contract' like the arbitration provision) that has been materially the same across all relevant versions of the Membership Agreement, including the

December 2014 version to which he actually agreed at account opening."

{¶ 36} Qualls asserts that he attached the February 2019 Membership Agreement to his complaint "only to support his substantive allegations regarding WPCU's unlawful assessment of certain NSF Fees," and the provisions related to NSF Fees "did not materially change over time." Qualls asserts that, in attaching "that particular version of the Membership Agreement to his Complaint, he did not concede that he received or was bound by the arbitration provision contained in that agreement. Qualls asserts that the trial court's failure to address his argument about the arbitration provision or to evaluate whether the Membership Agreement contained a valid arbitration provision was "error requiring reversal."

{¶ 37} Qualls asserts that "the 'Notice of Amendments' provision did not contemplate the addition of a new material arbitration term to the contract, only amendments to existing terms," and that he "had neither actual nor constructive notice of the purported arbitration provision in the July 2019 Membership Agreement or the earlier stray reference to arbitration." Qualls notes that WPCU admitted that it had neither mailed nor emailed him the February 2019 or July 2019 Membership Agreements; rather, it relied on its mailing of the July 2019 Membership Agreement to his mother and the fact that he and his mother were represented by the same counsel, whereas the Membership Agreement stated that notice would be addressed to him at his statement mailing address. Thus, Qualls asserts that, "even assuming counsel knew of the July 2019 Membership Agreement by virtue of their representation" of his mother, such knowledge could not be imputed to Qualls.

{¶ 38} Qualls asserts that WPCU incorrectly claimed in the trial court that he

"undertook the obligation of inquiry" by entering into an online banking agreement in which he agreed to electronically view any changes in information. He refutes WPCU's argument by pointing out that he registered for online banking prior to the changes in question, and he argues that WPCU failed in its burden of proving he agreed to view contract modifications online. He also points out that the "penultimate sentence" preceding the language quoted by WPCU in the 2017 Internet Account Access Agreement stated: "You agree to the *electronic delivery* of this agreement and the electronic funds transfer disclosure"; the agreement also stated that he "must have a valid e-mail address that WPCU will use to send informational notices" and immediately notify WPCU if the email address changed. Based on these statements, Qualls argues that a reasonable person would have assumed that any changes in disclosure would be delivered electronically via e-mail from WPCU, and he never got an email about the addition of the arbitration provision. He argues that at "a minimum, there is an ambiguity," and that his interpretation "must prevail."

{¶ 39} Qualls asserts that, by arguing that an agreement to arbitrate was formed simply by virtue of posting new versions of the Membership Agreement to the WPCU website, WPCU took a position that has been rejected by numerous courts that have considered browse wrap agreements. Qualls argues that such agreements posted to a website are not enforceable absent reasonable notice of their existence; he was under no duty to hunt for them, and the changes were not conspicuous. He asserts that, accordingly, there could have been no meeting of the minds as to any modification.

{¶ 40} Qualls asserts that whether he regularly and frequently visited WPCU's website, as WPCU claimed, was irrelevant, as this information did not establish that he

ever viewed any version of the Membership Agreement on WPCU's website. He points out that, of "the 6,572,843 unique visits to the website between July 31, 2019 and April 9, 2020, only 946 of those visits (0.01%) were to the Membership Agreement." Qualls argues that it would be unreasonable to expect him to do "that which 99.99% of WPCU's website visitors do not." Qualls asserts that "[k]nowing full well that nearly no one views the Membership Agreement online, WPCU should have known that no one knew when it attempted to unilaterally modify the Membership Agreement," and the trial court overlooked or ignored this evidence.

{¶ 41} Qualls asserts that, even if he could be charged with inquiry notice of the new arbitration provision (which he denies), WPCU's attempted addition of an arbitration provision fails for an additional reason: it was never contemplated in the original agreement, which did not allow the addition of *new terms.* Again relying on *Maestle*, 8th Dist. Cuyahoga No. 79827, 2005-Ohio-4120, Qualls argues that the "Notice of Amendments" provision in the December 2014 Membership Agreement and all subsequent versions of the agreement did not mention dispute resolution and, instead, referenced only certain subject matters. He asserts that the trial court should have concluded that no contract was formed via the purported arbitration provision and should have denied WPCU's motion to compel arbitration.

{¶ 42} Qualls asserts that WPCU admits that Section 3 of the Membership Agreement attached to his complaint directed members to a dispute resolution section that did not exist, and the trial court was wrong to conclude the language of Section 3 was "clear." Qualls asserts that a close reading of *W.K. v. Farrell,* 167 Ohio App.3d 14, 2006-Ohio-2676, 853 N.E.2d 728, shows that "the stray reference to an entirely undefined

'arbitration process' in the February 2019 Membership Agreement" was not analogous to the detailed arbitration terms present in that case.

{¶ 43} Qualls asserts that, although the trial court did not consider the July 2019 Membership Agreement that WPCU raised as an alternate ground for compelling arbitration, that agreement did not "provide an alternate ground for upholding the trial court's Order," because he was never provided with a copy of the July 2019 Membership Agreement and was not on notice of its existence. He therefore never agreed to the modifications included in the July 2019 Membership Agreement and could not be bound by its terms. He asserts that the trial court failed to address his argument that the arbitration provision in the July 2019 Membership Agreement was unconscionable and thus unenforceable. Qualls reiterates his arguments that the July 2019 Membership Agreement was procedurally and substantively unconscionable because of the parties' disparate sophistication in business matters, the lack of notice of the added arbitration provisions, WPCU's unilateral attempt to terminate his right to bring an action in court, the requirement that consumers split the cost of arbitration with WPCU regardless of the outcome, and WPCU's "one-sided" benefit from the provision.

{¶ 44} In response, WPCU asserts that Qualls admitted in his complaint that WPCU's February 2019 Membership Agreement "embodied" the terms of his contract with WPCU, and WPCU mailed further details regarding arbitration to Qualls' address in July 2019, over four months before he filed suit. WPCU also asserts that it provided Qualls with notice of the amendment through his attorneys and through its website, as previously-agreed upon by the parties, and the fact that he maintained his WPCU account reflected his acceptance of those terms.

{¶ 45} WPCU asserts that, as its member, Qualls "agreed to comply" with WPCU's Articles of Incorporation and Code of Regulations, the terms and conditions of its Membership Agreement and other documents, and he agreed to be bound by any amendments to those documents and agreements. According to WPCU, all of the versions the of the WPCU Membership Agreements for the entire time period that Qualls had been a member of WPCU contained the provision that WPCU could "change the terms of this Agreement and the other Account Documents at any time" and would notify him of "any changes in terms, rates or fees as required by law."

{¶ 46} WPCU asserts that Qualls relied on the February 2019 Agreement as the basis for his claims, which contained a dispute resolution provision requiring that the parties arbitrate any disputes. WPCU notes that it subsequently amended its Membership Agreement to include additional information regarding its arbitration procedure and a class action waiver," citing Section 8.25 of the July 2019 Membership Agreement. WPCU asserts that, by maintaining his accounts with WPCU, Qualls accepted the terms of the July 2019 Membership Agreement.

{¶ 47} WPCU asserts that it followed its agreed-to practices for notifying members of the July 2019 updates to the Membership Agreement by posting the agreement to its website and mailing the Agreement to Qualls' mailing address, although the addressee was his mother; at that time, Qualls' mother was represented by the same attorneys as Qualls.

{¶ 48} Further, WPCU asserts that when Qualls registered for online banking in 2015, he consented to the terms of WPCU's online banking agreement, which were also incorporated into the Membership Agreement. WPCU asserts that, pursuant to the

terms of the online banking agreement, Qualls agreed to electronically view any changes in disclosures, election information, or updates to WPCU products, services, and fees. WPCU asserts that, from July 31, 2019 to June 30, 2020, the Membership Agreement on WPCU's website included the arbitration provision set forth in Section 8.25, and that Qualls accessed the WPCU website and used online banking on a regular basis during this period.

{¶ 49} WPCU contends that the trial court correctly found that Qualls agreed to arbitrate any dispute he had with WPCU, and Qualls "judicially admitted as much." According to WPCU, there was no dispute that the matters asserted in Qualls' complaint were all referable to arbitration if the arbitration provision was enforceable, and Qualls failed to demonstrate that the provision was unenforceable.

{¶ 50} WPCU reiterates that the February 2019 Membership Agreement, upon which Qualls relied in his complaint, required him to resolve any dispute through arbitration, and that Qualls cannot "rely upon the February 2019 Agreement when it works to his advantage, but repudiate the contract when it works to his disadvantage such as by requiring arbitration of the dispute."  WPCU argues that Qualls' own judicial admission rendered unnecessary Qualls' claimed need for a "factual contract formation analysis."

{¶ 51} According to WPCU, the trial court correctly ruled that Qualls' own pleading admissions established his assent to the terms of the February 2019 Agreement, including the arbitration provision.  WPCU notes that Qualls never attempted to amend his complaint and never pled in the alternative that any earlier version of the Membership Agreement applied.  WPCU also contends that Qualls' assertion that the question of whether the February 2019 Agreement was a valid contract for purposes of his breach of

contract claim was " 'separate and distinct' from whether he admitted a 'separate contract to arbitrate was formed.' " WPCU argues that there was no support for "Qualls' proposition that his judicial admission related solely to the contract language on NSF Fees but not to the arbitration provision."

{¶ 52} WPCU asserts that Qualls also belatedly argues that the 2014 Membership Agreement is the operative contract, but if that were true, he should have attached that agreement to his complaint as the basis for his allegations. WPCU also asserts that it had no obligation to offer proof that it provided a copy of the February 2019 Membership Agreement to Qualls, because he admitted in his complaint "that the February 2019 Agreement was the operative contract and that its terms * * * applied to his claim."

{¶ 53} WPCU asserts that "a simple statement that the parties agree to resolve their disputes through arbitration is sufficient to establish a valid and enforceable agreement to arbitrate"; more details are not required in the document itself, and even a suggestion that the party look elsewhere for details regarding arbitration does not render the arbitration agreement unenforceable, because statutes and the common law "fill in the details."

{¶ 54} WPCU points out that the February 2019 Agreement upon which Qualls relied – and all of the other versions of that document – provided that WPCU could unilaterally amend the terms of the agreement; since no law requires prior notice of changes to the terms of an existing arbitration provision, WPCU could change the terms without notice, "precisely because the member/owners of WPCU granted it authority to do so." According to WPCU, Qualls gave "advance assent" when he became a member of WPCU to any modifications WPCU might make in the future and agreed that such

future changes to the Membership Agreement would control as soon as they were made. WPCU asserts that *Maestle* is distinguishable because WPCU "merely clarified and changed the terms of an already existing arbitration provision," and *Maestle* did "not negate the ability of the parties to amend the contract or enter into a new contract."

{¶ 55}  WPCU asserts that Qualls had never contested the elements of assent or consideration; and instead his only contention was that he did not received notice of the " 'offer' to arbitrate."   But WPCU argues that Qualls did have actual or constructive notice that the July 31, 2019 Membership Agreement provided additional details regarding arbitration.

{¶ 56} WPCU asserts that where "an offeree does not have actual notice of certain contract terms, he is nevertheless bound by such terms if he is on inquiry notice of them and assents to them through conduct that a reasonable person would understand to constitute assent."   It argues that Qualls' position that "he had no duty of inquiry falls short," and that just "like it is not required that a party actually read a contract in order to be bound by it, whether Qualls actually viewed the membership agreement on the website is irrelevant."

{¶ 57} WPCU asserts that Qualls' attorneys' knowledge of the arbitration provision must be imputed to him.   It argues that Qualls was "merely a replacement plaintiff" for his mother because she lost standing to pursue her claim.   "The scope of the attorneys' employment was to sue WPCU for allegedly improper NSF fees regardless of who exactly among the Qualls family was in the case caption, and there was no real separation between the joint venture of the Qualls and their attorneys."   WPCU asserts that there was nothing in the affidavits presented to suggest that Qualls was not already represented

by these attorneys in August 2019.

**{¶ 58}** Finally, WPCU asserts that the arbitration agreement was not unconscionable and that, because the trial court did not rule on unconscionability, that issue is not ripe for review on appeal. It asserts that Qualls never claimed the February 2019 Agreement was either procedurally or substantively unconscionable.

**Analysis**

**{¶ 59}** Qualls acknowledges in his brief that he agreed to the December 2014 Membership Agreement when he opened his account. That Agreement contains no reference to arbitration or alternative dispute resolution.

**{¶ 60}** The December 2014 Membership Agreement (Exhibit A to Clifford's Declaration), in the "Membership and Account Agreement" section, stated:

* * * This is a legally binding contract. Please READ and RETAIN this Agreement so that you can refer to it whenever you have a question about your account

* * * By signing an Account Card, each of you, jointly and severally, agree to the terms and conditions in this Agreement and Account Card, which includes the Electronic Fund Transfers Disclosure, the Funds Availability Policy Disclosure, the Truth-in-Savings Disclosure, the General Fee Schedule, the Rate Sheet, and any account Receipt accompanying this Agreement (collectively known as the "Account Documents"). Additionally, you agree to comply with the Credit Union's Articles of Incorporation and Code of Regulations and membership conditions (collectively known as the "Articles"), and any amendments to the Articles and Account Documents.

**{¶ 61}** Section 15 of the December 2014 Membership Agreement stated:

* * *

(b) **Notice of Amendments**. Except as prohibited by applicable law, we may change the terms of this Agreement and other Account Documents at any time. We will notify you of any change in terms, rates, or fees as required by law. We reserve the right to waive any term in this Agreement. Any such waiver shall not affect our right to future enforcement.

(c) **Effect of Notice**. * * * Any written notice we give to you is effective when it is deposited in the U.S. Mail, postage prepaid and addressed to you at your statement mailing address. * * *

**{¶ 62}** Section 25 of the December 2014 Membership Agreement stated: "This Agreement is governed by and shall be construed in accordance with the laws of the state of Ohio. Any action to enforce this Agreement shall be commenced in the Common Pleas Court of Greene County, Ohio."

**{¶ 63}** The 2014 Electronic Fund Transfers Disclosure, Section 7, provides: WPCU On-Line: You may access your account by using our Online Internet Account Service * * *. * * * Please refer to our separate Internet Account Access Agreement and Disclosure Statement and the General Fee Schedule for your rights and responsibilities and fees governing WPCU On-Line. * * *

**{¶ 64}** The February 2019 Membership Agreement (attached to Qualls' complaint), in a section entitled "Acceptance of Terms," provided: "By opening or maintaining your Credit Union account on or after the effective date of this Agreement, you agree that the

terms and conditions contained in this Agreement will govern your account and any services related to your account." The February 2019 Membership Agreement further provided:

1. Membership Agreement

1.1 Our Agreement

This Membership Agreement * * * covers your and our rights and responsibilities. * * *

This is a legally binding contract. Please READ and RETAIN this Agreement so that you can refer to it whenever you have a question about your account. * * * By signing an Account Card, each of you, jointly and severally, agree to the terms and conditions set forth in the Account Card, and all terms and conditions set forth in:

1. This Membership and Account Agreement, and

2. Current, applicable disclosure(s), and

3. Current Rate Sheet, and

4. Any account receipt accompanying this agreement (collectively known as the "Account Documents").

The documents referenced above also contain the Electronic Funds Transfer Disclosure, the Funds Availability Disclosure, and the Truth-in-Savings Disclosures. Additionally, you agree to comply with the Credit Union's Articles of Incorporation and Code of Regulations and membership conditions (collectively known as the "articles"), and any amendments to the Articles and Account Documents. * * *

\* \* \*

2.  Welcome to Your Credit Union

\* \* \*

This Agreement governs your Credit Union account(s) and related services, and replaces all prior account agreements with the Credit Union.

**{¶ 65}** As noted above, Section 3 of the February 2019 Membership Agreement, entitled "Reporting Errors and Dispute Resolution," stated that any dispute would "be resolved through an arbitration process further detailed in the Dispute Resolution section of the Account Agreement," although no such section existed.[1]

**{¶ 66}** Section 6 of the February 2019 Membership Agreement, the Electronic Fund Transfer Disclosure, provided in Sections 6.1(g) and 6.9 as follows regarding online banking: "You may access your account by using our Online Internet Account Service \* \* \*. \* \* \* Please refer to our separate Internet Account Access Agreement and Disclosure Statement and the current Account Disclosure fee schedule for your rights, responsibilities and fees governing Online Banking. \* \* \*."

**{¶ 67}** Section 8 of the February 2019 Membership Agreement was entitled "Account Terms and Conditions." Section 8.13, "Notices," provided:

\* \* \*

b) Notice of Amendments. Except as prohibited by applicable law, we may change the terms of this Agreement and the other Account Documents at any time. We will notify you of any changes in terms, rates, or fees as

---

[1] The January 2018 Membership Agreement attached to Attorney Clifford's declaration contained the same provision.

required by law. * * *

   c)   Effect of Notice.   * * * Any written notice we give to you is effective when it is deposited in the U.S. Mail, postage prepaid and addressed to you at your statement mailing address. * * *

**{¶ 68}** Section 8.23 of the February 2019 Membership Agreement stated that the Agreement was "governed by and shall be construed in accordance with the laws of the state of Ohio," and that any enforcement action must be brought in the Common Pleas Court of Greene County, Ohio.

**{¶ 69}** The first page of the July 2019 Membership Agreement had an "Acceptance of Terms" provision identical to that in the February 2019 Membership Agreement. Section 1 of the July 2019 Membership Agreement was identical to that in the February 2019 Membership Agreement.

**{¶ 70}** Section 3 of the July 2019 Membership Agreement was entitled "Reporting Errors and Dispute Resolution."   It provides: "If you have a dispute with the Credit Union and we are not able to resolve the dispute informally, you agree that the dispute will be resolved through an arbitration process further detailed in Section 8.25 Dispute Resolution and Exhaustion of Administrative Remedies below."

**{¶ 71}** Section 6 of the July 2019 Membership Agreement was identical to the 2019 February Membership Agreement set forth above.   Section 8 of the July 2019 Membership Agreement was entitled "Account Terms and Conditions," and Subsection 8.13 was identical to the same section in the February 2019 Membership Agreement.

**{¶ 72}** Subsection 8.23 of the July 2019 Membership Agreement provided:

   * * * Subject to Section 8.25 below, any action by you to enforce this

Agreement shall be commenced exclusively in the Common Pleas Court of Greene County, Ohio. * * * You[ ] further acknowledge and agree this section shall apply regardless of what type of claim you may allege against the Credit Union, including but not limited to contract, tort, regulatory, data breach, statutory, fiduciary duty breach, etc. * * *

{¶ 73} Subsection 8.25 of the July 2019 Membership Agreement provides:

* * * A fundamental principle of member service and satisfaction is to resolve all disputes with our members in a friendly and non-adversarial basis. Therefore, the procedures outlined in this Section are critically important to our overall mission of member services and satisfaction. * * *

Before you are permitted to proceed with a claim against the Credit Union as outlined in Section 8.23 above, you must request resolution of your claim in writing to the Credit Union by mandatory binding arbitration as outlined in this Section. * * * Your request must conspicuously state "REQUEST FOR ARBITRATION" near the top of the document * * *. The Credit Union shall have thirty (30) days after receipt of your request to do any of the following: (1) request an in person meeting with you to discuss your claims * * * (2) waive the right to mandatory arbitration, or (3) agree to mandatory arbitration. * * * Further, you agree to resolve your claim(s) with the Credit Union on an individual basis, and not participate in a collective class action proceeding.

If the Credit Union waives the right to arbitration then you may proceed with your claim as detailed in Section 8.23 above. If the Credit Union agrees to

arbitration then the following provisions apply. All claims and disputes arising under or relating to this Agreement are to be settled by binding arbitration in the state of Ohio. The arbitration shall be conducted on a confidential basis pursuant to the Commercial Arbitration Rules of the American Arbitration Association. * * * Consistent with said rules of the American Arbitration Association, the prevailing party may request reimbursement of its reasonable attorneys' fees for conducting the arbitration. Further, you agree to evenly split the costs of the arbitration with the Credit Union regardless of the outcome of the arbitration. * * *

* * *

{¶ 74} The July 2019 Membership Agreement concludes as follows: "IF YOUR CLAIM(S) AGAINST THE CREDIT UNION IS BASED ON A FEE OR FEES CHARGED BY THE CREDIT UNION TO YOU FOR ANY REASON OUR LIABILITY SHALL BE LIMITED TO THE AGGREGATE AMOUNT OF FEES PAID BY YOU TO THE CREDIT UNION DURING THE TWELVE (12) MONTHS IMMEDIATELY PRECEDING THE DATE ON WHICH YOU NOTIFIED THE CREDIT UNION OF YOUR CLAIM."

{¶ 75} Riley averred in her affidavit that WPCU posted Version 1 of the July 2019 Membership Agreement on its website on July 31, 2019, and that it posted Version 2 in October 2019. Riley averred that it had been WPCU's continuous and regular practice to maintain on its website the current version of the Membership Agreement and Account Documents, and that "from July 31, 2019 to June 30, 2020, the Membership Agreement displayed on the WPCU website * * * included the arbitration provision set forth in Section 8.25 above." She stated that Qualls had maintained his account at WPCU after the

effective date of the July 2019 Membership Agreement.

**{¶ 76}** Riley further averred that Qualls registered for online banking on August 31, 2015, and that "in order to do so, he had to consent to the terms of WPCU's online banking agreement," and that those terms were also incorporated into the Membership Agreement.

**{¶ 77}** The "[WPCU] Account Access Agreement, Optional Bill Pay Agreement and Disclosure Statement," dated July 27, 2017, provided that it:

> * * * IS A LEGALLY BINDING CONTRACT. BY USING THIS ELECTRONIC SERVICE, YOU AGREE TO BE BOUND BY THE TERMS AND CONDITIONS CONTAINED HEREIN AND ANY ADDITIONAL TERMS AND CONDITIONS THAT WE MAY COMMUNICATE TO YOU AND YOU AGREE TO THE ELECTRONIC DELIVERY OF THIS AGREEMENT * * *. PLEASE READ THE ENTIRE AGREEMENT. YOU MAY WANT TO PRINT A COPY OR REQUEST A WRITTEN COPY FOR YOUR RECORDS.
>
> YOU AGREE TO ELECTRONICALLY VIEW ANY CHANGES IN DISCLOSURES, ELECTION INFORMATION, OR UPDATES TO WPCU PRODUCTS, SERVICES, AND FEES. YOU MUST HAVE A VALID E-MAIL ADDRESS THAT WPCU WILL USE TO SEND INFORMATIONAL NOTICES. YOU AGREE TO IMMEDIATELY NOTIFY WPCU IF YOUR EMAIL ADDRESS CHANGES * * *. * * * WHEN YOU CANCEL ENROLLMENT IN ONLINE BANKING, WPCU WILL RESUME MAILING ALL OF YOUR CORRESPONDENCE AS ELECTED THROUGH THE U.S.

POSTAL SERVICE AT NO ADDITIONAL CHARGE TO YOU. * * * TO RECEIVE ONLINE BANKING SERVICES YOU UNDERSTAND THAT YOU MUST HAVE ACCESS TO THE NECESSARY HARDWARE AND SOFTWARE TO VIEW OR PRINT OR OTHERWISE ACCESS THE NECESSARY INFORMATION. * * *

{¶ 78} The online banking agreement provided: "You will be bound by this Agreement with your first use of ONLINE BANKING and/or BILLPAY SERVICE." It provides that "* * * your accounts * * * are also subject to the WPCU Membership and Account Agreement * * *."

{¶ 79} Section VII (17) of the online banking agreement provided:

A. NOTWITHSTANDING ANY OTHER AGREEMENT YOU HAVE WITH US, YOU AND WE MUTUALLY AND WILLINGLY WAIVE THE RIGHT TO A TRIAL BY JURY OF ANY AND ALL CONTROVERSIES, CLAIMS, OR DISPUTES ("DISPUTES") BETWEEN OR AMONG EITHER YOU OR US ARISING OUT OF, OR RELATING TO, THIS AGREEMENT AND USE OF ONLINE SERVICES. FURTHER, YOU AND WE AGREE THAT NEITHER YOU NOR WE WILL BE ENTITLED TO JOIN OR CONSOLIDATE ANY DISPUTE BY OR AGAINST OTHERS IN ANY ARBITRATION, OR TO INCLUDE IN ANY ARBITRATION ANY DISPUTE AS A REPRESENTATIVE OR MEMBER OF A CLASS, OR TO ACT IN ANY ARBITRATION IN INTEREST OF THE GENERAL PUBLIC OR IN A PRIVATE ATTORNEY GENERAL CAPACITY.

{¶ 80} In her deposition, when asked how the July 2019 Membership Agreement

was communicated to WPCU's membership as whole, Riley replied that it "would have been put on our website." When asked if the July 27, 2017 version of the Internet Account Access Agreement was the only version that has been in effect at WPCU, Riley responded, "My assumption is that there was another version prior to this. I just have not seen that version." She stated that she did not know how changes to the Internet Access Agreement were communicated to members.

{¶ 81} As this Court has noted:

"A contract is generally defined as a promise, or a set of promises, actionable upon breach. Essential elements of a contract include an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration." *Minster Farmers Coop. Exchange Co., Inc. v. Meyer,* 117 Ohio St.3d 459, 2008-Ohio-1259, 884 N.E.2d 1056, ¶ 28, quoting *Perlmuter Printing Co. v. Strome, Inc.,* 436 F.Supp. 409, 414 (N.D.Ohio 1976); *Kostelnik v. Helper,* 96 Ohio St.3d 1, 2002-Ohio-2985, 770 N.E.2d 58, ¶ 16. The parties must have a "meeting of the minds" as to the essential terms of the contract in order to enforce the contract. *Episcopal Retirement Homes, Inc. v. Ohio Dept. of Indus. Relations,* 61 Ohio St.3d 366, 369, 575 N.E.2d 134 (1991).

*Mishler v. Hale*, 2014-Ohio-5805, 26 N.E.3d 1260, ¶ 24 (2d Dist.).

{¶ 82} As noted by the Supreme Court of Ohio:

The Ohio General Assembly in R.C. Chapter 2711 has expressed a strong policy favoring arbitration of disputes. R.C. 2711.01(A) provides:

"A provision in any written contract * * * to settle by arbitration a controversy that subsequently arises out of the contract, or out of the refusal to perform the whole or any part of the contract, or any agreement in writing between two or more persons to submit to arbitration any controversy existing between them at the time of the agreement to submit, or arising after the agreement to submit, * * * shall be valid, irrevocable, and enforceable, except upon grounds that exist at law or in equity for the revocation of any contract."

Indeed, the Ohio courts recognize a "presumption favoring arbitration" that arises "when the claim in dispute falls within the scope of the arbitration provision." *Williams v. Aetna Fin. Co.* (1998), 83 Ohio St.3d 464, 471, 700 N.E.2d 859; *see also Ignazio v. Clear Channel Broadcasting, Inc.,* 113 Ohio St.3d 276, 2007-Ohio-1947, 865 N.E.2d 18, ¶ 18.

Ohio law directs trial courts to grant a stay of litigation in favor of arbitration pursuant to a written arbitration agreement on application of one of the parties, in accordance with R.C. 2711.02(B). That statute provides:

"If any action is brought upon any issue referable to arbitration under an agreement in writing for arbitration, the court in which the action is pending, upon being satisfied that the issue involved in the action is to arbitration under an agreement in writing for arbitration, shall on referable application of one of the parties stay the trial of the action until the arbitration of the issue has been had in accordance with the agreement, provided the applicant for the stay is not in

default in proceeding with arbitration."

Ohio law authorizes appellate review of such orders. R.C. 2711.02(C) provides:

> "[A]n order under division (B) of this section that grants or denies a stay of a trial of any action pending arbitration * * * is a final order and may be reviewed, affirmed, modified, or reversed on appeal pursuant to the Rules of Appellate Procedure and, to the extent not in conflict with those rules, Chapter 2505. of the Revised Code."

(Footnotes omitted.) *Taylor Bldg. Corp. of Am. v. Benfield*, 117 Ohio St.3d 352, 2008-Ohio-938, 884 N.E.2d 12, ¶ 25-31.

**{¶ 83}** Citing *Benfield*, WPCU notes that an appellate court reviews the grant or denial of a motion to stay proceedings pending arbitration under an abuse of discretion standard, not a de novo standard, as Qualls contends. In *Benfield*, the "narrow issue" was the standard of appellate review of an R.C. 2711.02(B) stay order when the underlying issue was whether the arbitration clause was unenforceable because of alleged unconscionability. *Id.* at ¶ 32. The Supreme Court determined as follows:

> Arbitration agreements are "valid, irrevocable, and enforceable, except upon grounds that exist at law or in equity for the revocation of any contract." R.C. 2711.01(A). Unconscionability is a ground for revocation of a contract. *See, e.g.*, *Williams* [*v. Aetna Fin. Co.*], 83 Ohio St.3d at 471, 700 N.E.2d 859.
>
> Unconscionability includes both " 'an absence of meaningful choice on the part of one of the parties together with contract terms which are

unreasonably favorable to the other party.' " *Lake Ridge Academy v. Carney* (1993), 66 Ohio St.3d 376, 383, 613 N.E.2d 183, quoting *Williams v. Walker-Thomas Furniture Co.* (C.A.D.C.1965), 350 F.2d 445, 449; see also *Collins v. Click Camera & Video, Inc.* (1993), 86 Ohio App.3d 826, 834, 621 N.E.2d 1294. The party asserting unconscionability of a contract bears the burden of proving that the agreement is both procedurally and substantively unconscionable. *See generally Ball v. Ohio State Home Servs., Inc.,* 168 Ohio App.3d 622, 2006-Ohio-4464, 861 N.E.2d 553, ¶ 6; *see also* [*Collins v.*] *Click Camera* [*& Video*], 86 Ohio App.3d at 834, 621 N.E.2d 1294, citing White & Summers, Uniform Commercial Code (1988) 219, Section 4-7 ("One must allege and prove a 'quantum' of both prongs in order to establish that a particular contract is unconscionable").

A determination of whether a written contract is unconscionable is an issue of law. See *Ins. Co. of N. Am. v. Automatic Sprinkler Corp. of Am.* (1981), 67 Ohio St.2d 91, 98, 21 O.O.3d 58, 423 N.E.2d 151; see also *Bolton v. Crockett Homes, Inc.,* 5th Dist. No. 2004CA00051, 2004-Ohio-7318, ¶ 8 (unconscionability of arbitration clause in home-construction agreement is a question of law). Courts review questions of law de novo. See, e.g., *Ignazio,* 113 Ohio St.3d 276, 2007-Ohio-1947, 865 N.E.2d 18, ¶ 19 (contract interpretation is a matter of law reviewable de novo); *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm* (1995), 73 Ohio St.3d 107, 108, 652 N.E.2d 684 (same). Federal courts in cases brought under the Federal Arbitration Act have applied de novo review to issues of contract

interpretation and enforceability of an arbitration clause alleged to be unconscionable. See, e.g., *Edwards v. HOVENSA, L.L.C.* (C.A.3, 2007), 497 F.3d 355, 362-363 (plenary review applied to determine enforceability of arbitration agreement alleged to be substantively unconscionable); *Faber v. Menard, Inc.* (C.A.8, 2004), 367 F.3d 1048, 1051 (de novo review of determination of arbitrability based on contract interpretation); *Sydnor v. Conseco Fin. Servicing Corp.* (C.A.4, 2001), 252 F.3d 302, 304-305 (de novo review of denial of motion to compel arbitration where arbitration clause asserted to be unconscionable).

*Benfield* at ¶ 33-35.

{¶ 84} The Ohio Supreme Court agreed "with the Ohio and federal courts that have applied a de novo standard of review to a determination whether an arbitration agreement alleged to be unconscionable is enforceable." *Id.* at ¶ 37. The Court further held:

When a trial court makes factual findings, however, supporting its determination that a contract is or is not unconscionable, such as any findings regarding the circumstances surrounding the making of the contract, those factual findings should be reviewed with great deference. See, e.g., *Nationwide Mut. Fire Ins. Co.*, 73 Ohio St.3d at 108, 652 N.E.2d determinations of fact which are given great deference"); *Myers v. Garson* (1993), 66 Ohio St.3d 610, 614, 614 N.E.2d 742 ("where the decision in a case turns upon credibility of testimony, and where there exists competent and credible evidence supporting the findings and conclusions of the trial court, deference to such findings and conclusions must be given by the

reviewing court"), citing *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 461 N.E.2d 1273 and *Cohen v. Lamko, Inc.* (1984), 10 Ohio St.3d 167, 10 OBR 500, 462 N.E.2d 407. See also Restatement of the Law 2d, Contracts (1981), Section 208, Comment *f* ("Incidental findings of fact are made by the court rather than by a jury, but are accorded the usual weight given to such findings of fact in appellate review").

*Id.* at ¶ 38.

{¶ 85} As the *Benfield* Court further noted:

As we explained in *ABM Farms* [*Inc. v. Woods*]*,* 81 Ohio St.3d [498, 501-502], 692 N.E.2d 574 [1998], R.C. 2711.01, like its federal counterpart, "acknowledges that an arbitration clause is, in effect, a contract within a contract, subject to revocation on its own merits." The court reasoned, "Because the arbitration clause is a separate entity, it only follows that an alleged failure of the contract in which it is contained does not affect the provision itself." *Id.* at 502, 692 N.E.2d 574. Thus, in *ABM Farms,* we held that to defeat a motion under R.C. 2711.02 for a stay of litigation in favor of arbitration, "a party must demonstrate that the arbitration provision itself in the contract at issue, and not merely the contract in general, was fraudulently induced." *Id.*, citing *Krafcik v. USA Energy Consultants, Inc.* (1995), 107 Ohio App.3d 59, 63, 667 N.E.2d 1027.

Similarly, when a party challenges an arbitration provision as unconscionable pursuant to R.C. 2711.01(A), the party must show that the

arbitration clause itself is unconscionable. If the court determines that the arbitration clause is enforceable, claims of unconscionability that relate to the contract generally, rather than the arbitration clause specifically, are properly left to the arbitrator in the first instance.

*Id.* at ¶ 41-42.

{¶ 86} As noted above, the December 2014 version of the Membership Agreement provided that by signing an account card, Qualls agreed to the conditions of the Membership Agreement and "*any amendments to the Articles and Account Documents,*" including amendments to the Membership Agreement. (Emphasis added.) The February 2019 Membership Agreement attached to his complaint included an additional condition that members' claims were subject to arbitration. As WPCU asserts, Qualls acknowledged in his complaint that his and WPCU's contractual relationship was embodied in that Membership Agreement and "related documentation." We cannot conclude, as Qualls urges, that the February 2019 Membership Agreement was not enforceable because it did not contain the referenced "Dispute Resolution Section." In *Corrpro Companies Inc. v. Bushman,* 8th Dist. Cuyahoga No. 72432, 1997 WL 565959 (Sep. 11, 1997), the Eighth District noted that the trial court therein "held that the arbitration clauses failed to articulate sufficient procedural guidelines and that this failure rendered the arbitration clauses invalid." *Id.* at *1. Quoting *K.G. Quick & Assocs., Inc. v. Phil Ross Organizational Seminars, Inc.,* 10th Dist. Franklin No. 89AP-1213, 1990 WL 80646, *1 (June 14, 1990), the Eighth District agreed that an " 'enforceable arbitration provision need only show the parties' intent to submit disputes to arbitration. It does not require all the details of the arbitration process. * * * Arbitration clauses do not need to be

long or complex; and they are not required to specify the arbitration methods to be employed.' " *Bushman* at *1. According to the Eighth District, the "touchstone of an enforceable arbitration agreement is a clear expression of intent to resolve a dispute through arbitration." Additionally, there is no requirement that an arbitration agreement be signed by either party in order to be enforceable; the only requirement is that the arbitration agreement be reduced to writing. *Farrell*, 167 Ohio App.3d 13, 2006-Ohio-2676, 853 N.E.2d 728, ¶ 24, citing *Brumm v. McDonald & Co. Secs., Inc.*, 78 Ohio App.3d 96, 102, 603 N.E.2d 1141 (1992).

{¶ 87} In *K.G. Quick*, the Tenth District considered the following contract clause: "In the event that litigation be required in matters of this Agreement all usual American Arbitration Association methods shall be employed." In finding the clause unenforceable, the court found:

> * * * To be enforceable, the language of the provision must indicate that the parties intended arbitration to be the sole method of dispute resolution. * * * The provision must, however, indicate to the contracting party that, by entering into the contract, it will forego the option to have disputes settled in the first instance in a court of law. The terms providing for arbitration must be clear. This is essential to the enforceability of an arbitration clause.

*Id.* at *1. The court further noted: "Technical wording is not required; the provision must simply state that disputes will specifically be submitted to arbitration. This is the minimum required to indicate that the parties intended to have disputes submitted to arbitration." *Id.* at *2.

**{¶ 88}** The February 2019 Membership Agreement (which Qualls acknowledged embodied the parties' contractual relationship) clearly provided that "you agree that the dispute will be resolved through arbitration." By continuing to maintain his account, pursuant to the "Acceptance of Terms" provision, Qualls manifested his assent to the arbitration provision, as well as by his continued use of online banking. The trial court did not err in concluding that Qualls had notice of the provision regarding arbitration of all claims.

**{¶ 89}** Further, WPCU reserved the right to "change the terms of this Agreement and the other Account Documents at any time." *See Stachurski v. DirectTV,* 642 F.Supp.2d 758, 769, citing *Englert v. Nutritional Sciences L.L.C.*, 10th Dist. Franklin No. 07AP989, 2008-Ohio-5062 ("The court noted that the dispositive factors in finding a unilateral reservation of rights provision valid are "unambiguous language, notice to the other party that the terms of the contract could be changed... and acceptance by that party of the risk involved" by agreeing to the provision.) Both the February and July 2019 Membership Agreements provided: "This Agreement governs your Credit Union account(s) and *replaces all prior account agreements with the Credit Union.*"

**{¶ 90}** The trial court also did not err in concluding that the arbitration provision in Section 8.25 in the July 2019 Membership Agreement was not unconscionable. Regarding procedural unconscionability, *Benfield* noted:

> * * * Procedural unconscionability considers the circumstances surrounding the contracting parties' bargaining, such as the parties' " 'age, education, intelligence, business acumen and experience, * * * who drafted the contract, * * * whether alterations in the printed terms were possible,

[and] whether there were alternative sources of supply for the goods in question.' " *Click Camera,* 86 Ohio App.3d at 834, 621 N.E.2d 1294, quoting *Johnson v. Mobil Oil Corp.* (E.D.Mich.1976), 415 F.Supp. 264, 268. "Factors which may contribute to a finding of unconscionability in the bargaining process [i.e., procedural unconscionability] include * * * knowledge of the stronger party that the weaker party is unable reasonably to protect his interests by reason of * * * ignorance, * * * or inability to understand the language of the agreement, or similar factors." Restatement of the Law 2d, Contracts (1981), Section 208, Comment *d*.

*Benfield*, 117 Ohio St.3d 352, 2008-Ohio-938, 884 N.E.2d 12, at ¶ 44.

**{¶ 91}** While Qualls argued that WPCU was "a sophisticated financial institution" and he, by contrast, was a college student who was only 18 years old when he first contracted with WPCU, as noted by the Eighth District, "[m]ere inequality of bargaining power is insufficient to invalidate an otherwise enforceable arbitration agreement. * * *." *Vanyo v. Clear Channel Worldwide*, 156 Ohio App.3d 706, 808 N.E.2d 472, 2004-Ohio-1793, ¶ 19, citing *Gilmer v. Interstate/Johnson Lane Corp.* (1991), 500 U.S. 20, 33, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991). *See also Hawkins v. O'Brien*, 2d Dist. Montgomery No. 22490, 2009-Ohio-60, ¶ 24, citing *Gilmer* ("There must be some evidence that, in consequence of the imbalance, the party in the weaker position was defrauded or coerced into agreement to the arbitration clause.")

**{¶ 92}** As the Eighth District further noted, an "important consideration is "whether 'each party to the contract, considering his obvious education or lack of it, [had] a reasonable opportunity to understand the terms of the contract, or were the important

terms hidden in a maze of fine print * * *?' * * *." *McCaskey v. Sanford Brown College*, 8th Dist. Cuyahoga No. 97261, 2012-Ohio-1543, ¶ 28. Although Qualls asserts that the arbitration provision in the July 2019 Membership Agreement was procedurally unconscionable because he had difficulty understanding the "legalese" therein, the important terms were not hidden in a maze of fine print, and the language in Section 8.25 was straightforward: "Before you are permitted to proceed with a claim against the Credit Union as outlined in Section 8.23 above, you must request resolution of your claim in writing to the Credit Union by mandatory binding arbitration as outlined in this section."

{¶ 93} We cannot agree with Qualls' assertion that the arbitration provision in the 2019 Membership Agreements was procedurally unconscionable because of the "circumstances surrounding the contracting parties' bargaining," namely that WPCU "added Section 8.25 to the July 2019 Membership during active litigation" in which Qualls was a putative class member, "without ever informing him of the addition or its effects on his rights in the pending litigation." As noted above, Attorney Clifford averred that Natalie Qualls filed her class action complaint in federal court on May 14, 2019, and that she dismissed it on August 8, 2019. Thus, the February 2019 Membership Agreement, with the enforceable arbitration clause, was in effect prior to Qualls' mother's filing suit against WPCU in May 2019, and any alleged rights Qualls might have claimed as a putative class member were extinguished when his mother's suit was dismissed. In other words, as WPCU asserts, "not only was Qualls precluded from being a putative class member in his mother's suit by way of the February 2019 arbitration provision, but no putative class existed as of August 8, 2019."

{¶ 94} Finally, as noted in *Gembarski v. Partssource, Inc.,* 157 Ohio St.3d 255,

2019-Ohio-3231, 134 N.E.3d 1175, ¶ 31:

> * * * [U]nnamed putative class members are not parties to an action prior to class certification. "Certification of a class is the critical act which reifies the unnamed class members and, critically, renders them subject to the court's power." *In re Checking Account Overdraft Litigation* [780 F.3d 1031,] at 1037. Absent class certification, there is no justiciable controversy between a defendant and the unnamed putative class members. *See Kincaid v. Erie Ins. Co.*, 128 Ohio St.3d 322, 2010-Ohio-6036, 944 N.E.2d 207, ¶ 17 (a controversy, to be justiciable, must be grounded on a present dispute, not a possible future dispute) * * *.

{¶ 95} Based upon the foregoing, the trial court properly concluded that Qualls failed to meet his burden to establish that the arbitration provision was procedurally unconscionable.

{¶ 96} "The conclusion that the arbitration clause * * * is not procedurally unconscionable defeats [a defendant's] contention that the arbitration clause is unenforceable due to unconscionability. * * * [T]he party challenging a contract as unconscionable must prove 'a quantum' of both procedural and substantive unconscionability." *Benfield,* 117 Ohio St.3d 352, 2008-Ohio-938, 884 N.E.2d 12, at ¶ 53. Nevertheless, we will briefly address Qualls' claim of substantive unconscionability.

{¶ 97} As noted in *Click Camera,* 86 Ohio App.3d at 834, 621 N.E.2d 1294:

> Substantive unconscionability involves those factors which relate to the contract terms themselves and whether they are commercially reasonable. Because the determination of commercial reasonableness

varies with the content of the contract terms at issue in any given case, no generally accepted list of factors has been developed for this category of unconscionability. However, courts examining whether a particular limitations clause is substantively unconscionable have considered the following factors: the fairness of the terms, the charge for the service rendered, the standard in the industry, and the ability to accurately predict the extent of future liability. * * *

**{¶ 98}** According to Qualls, Section 8.25 of the Membership Agreement was substantively unconscionable because it was "heavily one-sided in WPCU's favor" in that it provided that WPCU alone could decide whether to require arbitration or allow the dispute to be litigated in the courts. We note that the "fact that a contractual provision is one-sided does not render it substantively unconscionable per se." *Hayes v. Oakridge Home*, 122 Ohio St.3d 63, 2009-Ohio-2054, 908 N.E.2d 408, ¶ 36. "[T]he obligations of the parties need not be exactly the same if the contract is supported by adequate considerations." *Benfield* at ¶ 66.

**{¶ 99}** Qualls directs our attention to *Post v. ProCare Automotive Serv. Solutions*, 8th Dist. Cuyahoga No. 87646, 2007-Ohio-2106. The employment contract at issue therein contained an arbitration clause and provided that "nothing in this Paragraph 15 shall be construed so as to deny Employer's right and power to seek and obtain injunctive relief in a court of equity for any breach or threatened breach of Employee of any of his covenants contained in Paragraph 6." The Eighth District was unpersuaded by ProCare's assertion that this provision, which allowed ProCare to use a judicial forum when it was the plaintiff, but limited an employee to arbitration when he was the plaintiff,

was not unconscionable. *Id.* at ¶ 17. Having concluded that the arbitration clause was substantively unconscionable, the court remanded the matter for the trial court to hold a hearing to determine whether the arbitration clause was also procedurally unconscionable. *Id.* at ¶ 30.

{¶ 100} With respect to the *Post* opinion, we find persuasive the opinion of Judge Cooney, who concurred in part and dissented in part, and who concluded that the arbitration clause was not unconscionable. The following was significant to Judge Cooney regarding the waiver of the right to arbitrate:

> Merely because the employer need not arbitrate a claim for injunctive or equitable relief involving trade secrets or competition does not make the arbitration agreement unreasonable. *Robbins v. Country Club Ret. Ctr. IV, Inc.,* Belmont App. No. 04BE43, 2005-Ohio-1338. [The employee] cites no authority to support his claim that the arbitration clause is unenforceable because it does not cover every type of possible lawsuit.

*Id.* at ¶ 54 (Cooney, P.J., concurring in part and dissenting in part).

{¶ 101} The nature of the contract at issue was also significant to Judge Cooney: "[I]n the context of employment contracts, when a candidate for employment is free to look elsewhere for employment and is not otherwise forced to consent to the arbitration agreement, the agreement to arbitrate is not unconscionable." *Id.* at ¶ 56. Like an employee, Qualls was "free to look elsewhere" for banking services. Most significantly, Qualls failed to meet his burden regarding procedural unconscionability, which was fatal to his claim of unconscionability.

{¶ 102} Finally, Qualls asserts that Section 8.25 was substantively unconscionable

because it required consumers to " 'agree to evenly split the costs of the arbitration with the Credit Union *regardless of the outcome of the arbitration.*' " As noted in *Benfield*, "the mere risk that a plaintiff would be forced to pay exorbitant costs is too speculative to justify invalidation of the arbitration agreement." *Benfield*, 117 Ohio St.3d 352, 2008-Ohio-938, 884 N.E.2d 12, at ¶ 58. "Without some evidence that a party would be precluded from bringing a claim, the cost of arbitration, standing alone, is not a justifiable reason to find unconscionability." *McCaskey,* 8th Dist. Cuyahoga No. 97261, 2012-Ohio-1543, at ¶ 34. The court "required specific and individualized evidence that arbitration costs were unduly burdensome to the party opposing it." *Id.* at ¶ 32. *See also Handler v. Southerland Custom Builders, Inc.,* 8th Dist. Cuyahoga No. 86956, 2006-Ohio-4371, ¶ 19 ("[B]ecause homeowners failed to provide any evidence, other than initial fees, that the cost of arbitration would exceed the cost of litigation, the arbitration clause cannot be said to be substantively unconscionable on the basis of cost.").

{¶ 103} Finally, as Judge Cooney observed in *Post*, "although the cost of arbitration may be high, so too is the cost of litigating a claim. Indeed, it is quite possible that litigation could result in substantial legal fees and costs that, in the end, exceed the cost of arbitration." *Post,* 8th Dist. Cuyahoga No. 87646, 2007-Ohio-2106, at ¶ 18 (Cooney, P.J., concurring in part and dissenting in part). *See also English v. Cornwall Quality Tools Co., Inc.,* 9th Dist. Summit No. 22578, 2005-Ohio-6983, ¶ 17 (even where the plaintiff provided specific estimates as to various costs associated with arbitration, the court held that, in the absence of "evidence of the expected cost differential between arbitration and litigation," the arbitration clause was enforceable).

{¶ 104} There is no evidence in the record regarding Qualls' income or the

difference in cost between arbitration and litigation.    Thus, the argument was speculative, and it fails.

{¶ 105} For the foregoing reasons, Qualls' assignment of error is overruled.

{¶ 106} The judgment of the trial court is affirmed.

. . . . . . . . . . . . .

HALL, J. and WELBAUM, J., concur.

Copies sent to:

Stuart E. Scott
Kevin C. Hulick
James R. Branit
Daniel C. Gibson
Hon. Michael A. Buckwalter